UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ROBERT LUIZZI and JOSEPHINE LUIZZI,

                              Plaintiffs,

              - against -

PRO TRANSPORT INC. and LUIS SANCHEZ,

                              Defendants,

-----------------------------------------------------------------X
LUIS SANCHEZ,

                     Defendant/Third-Party Plaintiff,

              - against -

STATE NATIONAL INSURANCE COMPANY and
ONE BEACON INSURANCE COMPANY d/b/a
GENERAL ACCIDENT INSURANCE COMPANY,

                              Third-Party Defendants,
-----------------------------------------------------------------X
STATE NATIONAL INSURANCE COMPANY,

                     Second Third-Party Plaintiff,

              - against -

GREEN MOUNTAIN AGENCY, INC.,

                     Second Third-Party Defendant.
-----------------------------------------------------------------X

**MEMORANDUM
A N D    ORDER**

02 CV 5388 (CLP)

         On September 25, 2002, plaintiffs Robert and Josephine Luizzi commenced this personal

injury action against defendants Pro Transport, Inc. ("Pro Transport") and Luis Sanchez

("Sanchez") in New York Supreme Court, Kings County, seeking damages for injuries suffered

by Robert Luizzi during a traffic accident that occurred on September 22, 2001. Defendant Sanchez removed the action to this Court on October 4, 2002. A framed issue hearing was held before this Court on January 17, 18, and 22, 2007, for the purpose of determining whether the State National Insurance Company policy issued to defendant Pro Transport had been effectively cancelled prior to the date of the accident at issue.

For the reasons set forth below, the Court finds that the policy was not effectively cancelled in accordance with New Jersey law.

## FACTUAL AND PROCEDURAL HISTORY

The instant action stems from an accident that occurred on September 22, 2001, at the intersection of Van Dam Street and Queens Boulevard, when a tractor trailer driven by defendant Luis Sanchez, and allegedly owned by Pro Transport, came into contact with the car driven by plaintiff Robert Luizzi. (Luizzi Compl. ¶¶ 3-7).[1] Robert Luizzi alleges that he suffered "serious personal injuries" as a result of the alleged "negligence and carelessness" of defendants Sanchez and Pro Transport. (Id. ¶¶ 8-9). Plaintiff Josephine Luizzi seeks damages as a result of the loss of her husband's services. (Id. ¶¶ 14-16).

On October 17, 2002, defendant Sanchez filed an answer and asserted a cross claim seeking contribution and indemnification from his co-defendant Pro Transport, alleging that Pro Transport was the owner of the trailer that was leased to Sanchez and that Sanchez was in the process of hauling and performing services for Pro Transport at the time of the accident.

---

[1]Citations to "Luizzi Compl." refer to the Complaint filed by Robert and Josephine Luizzi on October 4, 2002.

(Sanchez Ans. ¶¶ 29, 30, 35, 36).[2]  When defendant Pro Transport failed to answer or otherwise respond to plaintiffs' Complaint and did not respond to the cross claims of defendant Sanchez, the Clerk of the Court entered a default on May 19, 2003, and the case was subsequently referred to the undersigned to conduct an inquest on the issue of damages.  On June 17, 2003, this Court deferred a calculation of damages until the claims against the remaining defendant, Luis Sanchez, could be resolved.[3]

Thereafter, during a conference held before this Court on September 16, 2004, at which Pro Transport appeared with counsel, the parties agreed that the default previously entered against Pro Transport should be vacated and a stipulation to this effect was signed by all parties and entered on December 6, 2004.  On December 22, 2004, Pro Transport filed its Answer, in which it also asserted a cross claim against defendant Sanchez, alleging that at no time did Pro Transport own, operate, control, or lease either the tractor or the trailer involved in the Luizzi accident.  (Pro Transport Ans. ¶ 19).[4]  The cross claim further alleged that at the time of the accident, Sanchez was operating a tractor wholly owned by him, which was connected to a trailer under his control.  (Id. ¶ 18).  Pro Transport further alleged that to the extent that Sanchez was proven to be engaged in the performance of services for Pro Transport, any damages sustained by

---

[2]Citations to "Sanchez Ans." refer to the Answer filed by Luis Sanchez on October 17, 2002.

[3]On June 17, 2004, Robert and Josephine Luizzi and Louis Sanchez consented to refer this action to the undersigned for all purposes including entry of judgment.  The case was reassigned on June 21, 2004, and Pro Transport submitted to the jurisdiction of the Court on December 6, 2004.

[4]Citations to "Pro Transport Ans." refer to the Answer filed by Pro Transport on December 22, 2004.

Luizzi were due to the negligence of Sanchez. (Id. ¶ 20).

On June 3, 2005, Sanchez filed a Third-Party Complaint against State National Insurance Company ("State National"), alleging that on March 9, 2001, Green Mountain Agency, Inc. ("Green Mountain"), an insurance wholesaler and agent for State National (State Nat. Compl. ¶¶ 7-16),[5] had issued a commercial trucking insurance policy to Pro Transport, which covered scheduled, hired, and non-owned autos operated on behalf of or in the business of Pro Transport. (Sanchez Compl. ¶¶ 29, 30).[6] The Third Party Complaint asserts that under this insurance policy, State National and Pro Transport owe a duty to defend, indemnify, and hold Sanchez harmless for any judgments or awards stemming from the Luizzi accident. (Id. ¶¶ 31, 32, 33).

On July 29, 2005, in its Answer to Sanchez's Third-Party Complaint, State National claimed as an affirmative defense that "any policy of insurance . . . issued to the defendant . . . was cancelled in a timely and proper manner prior to the date of the alleged accident." (State Nat. Ans. at 6).[7] On February 9, 2006, State National filed a Second Third-Party Complaint against Green Mountain Agency, alleging that Green Mountain, acting as agent for State National,[8] issued the Commercial Trucking Policy to Pro Transport. (State Nat. Comp. ¶¶ 20,

---

[5]Citations to "State Nat. Compl." refer to the Second Third-Party Complaint filed by State National on February 9, 2006.

[6]Citations to "Sanchez Compl." refer to defendant Sanchez's Third-Party Complaint filed on June 3, 2005. The Third Party Complaint also named One Beacon Insurance Company d/b/a General Accident Insurance Company ("One Beacon") as a defendant. However, One Beacon was dismissed from the suit on February 8, 2006.

[7]Citations to "State Nat. Ans." refer to the Verified Answer to the Third-Party Complaint filed by State National Insurance Company on July 29, 2005.

[8]According to State National, it had entered into an agreement with Reliant American Insurance Company ("Reliant") to write insurance policies in New York and New Jersey. (State

21). The State National Complaint further alleges that on or about March 29, 2001, a Green Mountain employee requested that the Pro Transport policy be cancelled for non-payment of the insurance premiums, with the cancellation to become effective May 3, 2001. (Id. ¶¶ 22, 23). According to the State National Complaint, due to Green Mountain's negligence, the Notice of Cancellation was not properly mailed to the insured, or if properly mailed, failed to contain the required documentation. (Id. ¶¶ 25-29). As a result of the improper mailing, the Complaint alleges that "State National has been forced to defend the declaratory judgment action brought by defendant/third party plaintiff [Sanchez]." (State Nat. Compl. ¶ 27). Green Mountain, in its Answer to State National's Second Third-Party Complaint, claims that the insurance policy issued for Pro Transport was "cancelled in a timely and proper manner prior to the date of the alleged accident." (Green Mt. Ans. ¶ 43).[9]

It is not in dispute that the premium owed for the State National insurance policy issued to Pro Transport by Green Mountain was $6,922.00, or $576.83 per month. (Tr. at 135-37).[10] It also does not appear to be disputed that the premium was never fully paid. (Id. at 137). Instead, it appears that Garden State Brokers ("Garden State"),[11] on Pro Transport's behalf, paid only

---

Nat. Compl. ¶ 13). Reliant, in turn, had contracted with Green Mountain, who then issued policies on behalf of State National. (Id. ¶¶ 14-16).

[9]Citations to "Green Mt. Ans." refer to the Second Third-Party Answer filed by Green Mountain on August 8, 2006.

[10]Citations to "Tr." refer to the framed issue hearing held before this Court on January 17, 18, and 22, 2007. Citations to "G-M Ex." refer to the trial exhibits introduced at the hearing by Green Mountain.

[11]Garden State, acting as a commercial underwriter, was "duly authorized by [Green Mountain] to deliver policies to [Green Mountain's] customers and to receive and collect the premiums therefor." As a result, Garden State, on Pro Transport's behalf, paid premiums to

$1,780.50 toward the total premium owed, prompting Green Mountain to cancel the policy. (Id.) Pursuant to that decision, Green Mountain prepared a Notice of Cancellation dated March 29, 2001, which Green Mountain claims to have sent to Pro Transport by certified mail on that date in accordance with the New Jersey statute that sets forth the procedures governing written cancellation of automobile insurance policies. See N.J. Stat. Ann. 17:29C-10 (2007). (See also G-M Ex. 1-H; Green Mt. Mem. at 2;[12] Green Mt. Trial Br. at 1).[13]

Luizzi and Pro Transport claim that Pro Transport never received this Notice of Cancellation because Green Mountain sent the document to Pro Tran, Inc., "an unrelated entity." (Luizzi Trial Br. at 1; Sanchez Trial Br. at 11-12).[14] Luizzi, Pro Transport, and Sanchez argue that because Green Mountain failed to abide by the requirements of the New Jersey statute governing cancellation (see Luizzi Resp.[15] at 1-2; Sanchez Trial Br. at 7-8), the State National insurance policy was never properly cancelled, and therefore was in effect on the date of the alleged accident. (Id.) Green Mountain asserts that its cancellation of the policy fully comported

---

Green Mountain, which in turn was acting as the agent for State National. (See G-M Ex. 1-F). See also Spilka v. South America Managers, Inc., 54 N.J. 452, 463, 255 A.2d 755, 761 (1969) (citing 14 Appleman, Insurance Law and Practice, § 7985 (1944)).

[12]Citations to "Green Mt. Mem." refer to Green Mountain's Memorandum of Law on the Cancellation Issue, filed on January 12, 2007.

[13]Citations to "Green Mt. Trial Br." refer to the Post-Trial Brief filed by Green Mountain on February 14, 2007.

[14]Citations to "Luizzi Trial Br." refer to the Post-Trial Brief filed by Luizzi on February 13, 2007. Citations to "Sanchez Trial Br." refer to the Post-Trial Brief filed by Sanchez on February 13, 2007.

[15]Citations to "Luizzi Resp." refer to the Response to Green Mountain's Post-Trial Brief, filed by Luizzi on March 14, 2007.

with the statutory requirements of N.J.S.A. 17:29C-10, and thus, the insurance policy was not in effect on the date of the accident. (Green Mt. Trial Br. at 1, 8).

A framed issue hearing was held before this Court on January 17, 18, and 22, 2007, to determine the effectiveness of the Notice of Cancellation of the State National policy sent by Green Mountain to Pro Transport.


## DISCUSSION

A. Governing Law

1) Choice of Law Analysis

Where, as here, the jurisdiction of the district court rests on the diversity of the parties, the district court applies the choice of law principles of the forum state to determine the appropriate substantive law to apply. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938). Under New York's choice of law rules, where the action arises out of a dispute over an insurance contract, the court applies the law of the state where the policy was issued. Government Employees Ins. Co. v. Sheerin, 65 A.D.2d 10, 13, 410 N.Y.S.2d 641, 643 (2d Dep't 1978) (applying New Jersey law in diversity case where car accident occurred in New York and insurance policy was issued to driver in New Jersey); see also American Centennial Ins. Co. v. Sinkler, 903 F. Supp. 408, 412 (E.D.N.Y. 1995).

In the instant case, Green Mountain issued the insurance policy to Pro Transport in the State of New Jersey. (State Nat. Compl. ¶¶ 10, 12-16). Therefore, it is undisputed that New Jersey law governs and sets the standards for insurance policy cancellation. See Government Employees Ins. Co. v. Sheerin, 65 A.D.2d at 13, 410 N.Y.S.2d at 643.

2) New Jersey Statute Section 17:29C-10

Under New Jersey law, a notice of cancellation of an automobile insurance policy will only be effective if the requirements of New Jersey Statute, Section 17:29C-10, are met. See Weathers v. Hartford Ins. Group, 77 N.J. 228, 234, 390 A.2d 548, 550 (1978); Hodges v. Pennsylvania Nat. Ins. Co., 260 N.J. Super. 217, 223, 615 A.2d 1259, 1262 (App. Div. 1992); Celino v. General Accident Ins. Co., 211 N.J. Super. 538, 542-43, 512 A.2d 496, 498-99 (App. Div. 1986). New Jersey Statute Annotated § 17:29C-10 provides that in order to be effective, a written notice of cancellation must either be sent by certified mail or by regular mail with a date stamped proof of mailing from the Post Office. In addition, the statute requires the insurer to retain a duplicate copy of the mailed notice. The statute states in full:

> No written notice of cancellation or of intention not to renew sent by an insurer to an insured in accordance with the provisions of an automobile insurance policy shall be effective unless a. (1) it is sent by certified mail or (2) at the time of the mailing of said notice, by regular mail, the insurer has obtained from the Post Office Department a date stamped proof of mailing showing the name and address of the insured and b. the insurer has retained a duplicate copy of the mailed notice which is certified to be a true copy.

N.J. Stat. Ann. § 17:29C-10 (2007).

To be effective, a written notice of cancellation must be prepared and sent out in accordance with the requirements laid out above. See Hodges v. Pennsylvania Nat. Ins. Co., 260 N.J. Super. at 223, 615 A.2d at 1262; Needham v. New Jersey Ins. Underwriting Ass'n, 230 N.J. Super. 358, 369, 553 A.2d 821, 827 (App. Div. 1989); Celino v. General Accident Ins. Co., 211 N.J. Super. at 542-43. The law reflects the public policy of New Jersey to "provid[e] the appropriate criteria for assessing what evidence an insurer must additionally present to satisfy its

8

burden of proving effective regular mail notice" to an insured. <u>Valley Nat. Bancorp. v. American Motorists Ins. Co.</u>, 316 N.J. Super. 152, 158, 719 A.2d 1028, 1031 (App. Div. 1998).

Under the express language of the statute, a mailing that does not satisfy both of the conditions is ineffective. <u>Celino v. General Accident Ins. Co.</u>, 211 N.J. Super. at 543, 512 A.2d at 499. If there is no dispute about receipt of the notice, courts generally do not require proof of strict compliance with the statute unless the insured asserts that prejudice has resulted from the insurer's non-compliance. <u>See</u> <u>Public Serv. Elec. & Gas v. Uphold</u>, 316 N.J. Super. 168, 174, 719 A.2d 1268, 1271 (App. Div. 1998). However, when an insured party denies receipt of the notice of cancellation, the insurer must demonstrate that it has strictly complied with the provisions of the statute. <u>See</u> <u>Celino v. General Accident Ins. Co.</u>, 211 N.J. Super. at 542-43, 512 A.2d at 498-99. In such circumstances, the inability to show strict compliance with both subsections of N.J.S.A. § 17:29C-10 has been found to render a cancellation ineffective. <u>Id.</u>, 211 N.J. Super. at 543, 512 A.2d at 499.

The law "accords at the very least a strong presumption of effectiveness to a proof of mailing which does comply." <u>Id.</u> Thus, in <u>Needham v. New Jersey Ins. Underwriting Ass'n</u>, the Superior Court of New Jersey, Appellate Division, held that "cancellation [of an insurance policy] would be effective whether or not plaintiff actually received the notice of cancellation because mailing of the notice, not receipt, was the determinative factor." 230 N.J. Super. at 369, 553 A.2d at 827. However, other courts have held that the insured may introduce evidence of non-receipt of the notice of cancellation "for the purpose of refuting the hypothesis of mailing."

Weathers v. Hartford Ins. Group, 77 N.J. at 235, 390 A.2d at 551;[16] see also Celino v. General

Accident Ins. Co., 211 N.J. Super. at 542, 512 A.2d at 499; State v. Hochman, 188 N.J. Super.

382, 388-89, 457 A.2d 1156, 1160 (App. Div. 1982).

New Jersey courts have held that an insurer may invoke a presumption that a mailed item

has been received by a party when it can be proven "(1) that the mailing was correctly addressed;

(2) that proper postage was affixed; (3) that the return address was correct; and (4) that the

mailing was deposited in a proper mail receptacle or at the post office." SSI Med. Servs. Inc. v.

State Dept. of Human Servs., 146 N.J. 614, 621, 685 A.2d 1, 4-5 (1996). However, "proper

mailing of a particular notice [can]not be conclusively established by evidence consisting only of

a certificate of mailing and testimony respecting the standard procedures of the company in

preparing and mailing notices." Celino v. General Accident Ins. Co., 211 N.J. Super. at 542, 512

A.2d at 498 (citing Weathers v. Hartford Ins. Group, 77 N.J. at 234-36, 390 A.2d at 550-51).

Evidence of office custom may be introduced, but courts have "require[d] other corroboration

that the custom was followed in a particular instance, in order to raise a presumption of mailing

and receipt and meet the preponderance of the evidence standard." SSI Med. Servs. Inc. v. State

Dept. of Human Servs., 146 N.J. at 622-23, 685 A.2d at 5 (citing Cwiklinski v. Burton, 217 N.J.

Super. 506, 510, 526 A.2d 271, 273-74 (App. Div. 1987)).

---

[16]Although the holding in Weathers with regards to the sufficiency of proof for
demonstrating proper mailing of a notice of cancellation was superceded by the 1980 amendment
to N.J.S.A. § 17:29C-10, see Munoz v. New Jersey Auto. Full Ins. Underwriting Ass'n, 145 N.J.
377, 387, 678 A.2d 1051, 1056 (1996), New Jersey courts have continued to cite to other aspects
of the Weathers case, including that portion of the opinion that allows an insurer to offer
evidence of non-receipt of the notice of cancellation. See Needham v. New Jersey Ins.
Underwriting Ass'n, 230 N.J. Super. at 369, 553 A.2d at 827; Celino v. General Accident Ins.
Co., 211 N.J. Super. at 542, 512 A.2d at 499; State v. Hochman, 188 N.J. Super. at 388-89, 457
A.2d at 1160.

Such corroborating evidence usually comes from the "testimony of the person whose duty it is to perform or carry out the custom." Cwiklinski v. Burton, 217 N.J. Super. at 510, 526 A.2d at 273 (italics removed). The relevant testimony must be obtained "from one who actually mails the notices or letters." Id., 217 N.J. Super. at 511, 526 A.2d at 274. "The whole point of the requirement is to permit a clerical employee or other custodian of the business record to testify that the file copy is known to be a true copy of the mailed document because the person mailing it so certified at that time." Celino v. General Accident Ins. Co., 211 N.J. Super. at 543, 512 A.2d at 499. Even when the insurer can present evidence such as the certificate of mailing, a certified office copy of the notice, and testimony as to standard office procedures, courts have held that "testimony from one who actually mails the notices or letters is necessary to establish conclusively the fact of mailing." Cwiklinski v. Burton, 217 N.J. Super. at 511, 526 A.2d at 274. See also Needham v. New Jersey Ins. Underwriting Ass'n, 230 N.J. Super. at 371, 553 A.2d at 828. In the absence of testimony from the person who actually mailed the notice, certification by a servicing agent without personal knowledge and lacking evidence of the mailing practice and procedure actually followed has been found "clearly" insufficient as a matter of law to establish a presumption of mailing. See Lopez v. New Jersey Auto. Full Ins. Underwriting Ass'n, 239 N.J. Super. 13, 24, 570 A.2d 994, 999 (App. Div. 1990).

B. Application

Green Mountain claims that because it sent the Notice of Cancellation by certified mail and maintained a copy of the Notice containing the requisite certification, it complied with the two provisions of N.J.S.A. § 17:29C-10 and the presumption of receipt should apply. (Green Mt.

11

Trial Br. at 1). Mr. Pagan, testifying on behalf of Pro Transport, has denied ever receiving the Notice of Cancellation and challenges the presumption of mailing, contending that the certification was insufficient and that the Notice was mailed to the wrong address. (Tr. at 302-03).

1) Green Mountain's Mailing Procedures

In attempting to establish its compliance with the statute, Green Mountain offered the testimony of two witnesses: (1) Thomas Palumbo, currently Executive Vice President of Green Mountain, who testified about Green Mountain's practices and procedures in 2001, and (2) Frank Mongielo, a retired letter carrier of 32 years, who testified as an expert witness on the practices and procedures of the United States Postal Service in 2001.

Thomas Palumbo testified that he started with Green Mountain in 1990 and was "involved in setting up [their] practices and procedures." (Tr. at 20-22). He continues to act as a custodian of records and is charged with ensuring that Green Mountain records and files are maintained "pursuant to regulation and contract." (Id.) According to Mr. Palumbo, in 2001, it was the standard practice of Green Mountain to prepare notices of cancellation containing, among other things, the reason for cancellation, the insurance policy number, names and addresses of the broker and insured, the effective date and time of cancellation, date of mailing, and terms and conditions of the cancellation notice. (Id. at 46-47). During the relevant period, Green Mountain used window envelopes to mail all cancellation notices. (Id. at 57-59). The clerk responsible for mailing the notice would fold the notice in such a way that the name and address of the insured could be seen through the window portion of the envelope. (Id. at 59).

The window envelopes used by Green Mountain contained the pre-printed words "Address Service Requested," which is a service provided by the Post Office to notify the sender if the addressee is not located at the address referenced on the envelope. (Id. at 59, 239).

According to Mr. Palumbo, Green Mountain's practice was to retain a duplicate copy of the mailed cancellation notice in its files. (Id. at 47-49). The clerk who prepared the cancellation notice placed the certification that the mailed notice is an "'exact carbon copy of which appears above'" on the retained copy and prepared the Postal Service forms for mailing. (Id. at 49, 53, 71; G-M Ex. 1-14).

Mr. Palumbo testified that in 2001, Green Mountain's practice was to send notices of cancellation by certified mail, return receipt requested. Indeed, New Jersey Statute Section 17:29C-10 provides that a notice of cancellation may be effective if "sent by Certified Mail." In order to mail an item by certified mail, a mailer must comply with the procedures set forth in Section 2.5 of the United States Postal Service's Domestic Mail Manual, which provides as follows:

> A mailer of certified mail must:
> a. Enter on Form 3800 the name and complete address of the person or firm to whom the mail is addressed.

(Pls.' Ex.[17] B).

According to Mr. Palumbo, in 2001, the Form 3800, or "green card," contained two sections. (Tr. at 214-15). One section, which was affixed to the front of the envelope, contained an article number and a bar code. (Id.) The other section, which also contained the article

---

[17]Citations to "Pls.' Ex." refer to the trial exhibits introduced by plaintiffs at the framed issue hearing.

number, was detachable and could be retained by the sender as proof of mailing. (Id. at 68-70, 214-15).[18] Green Mountain's Postal Service expert, Frank Mongielo, a retired letter carrier of 32 years,[19] identified a photocopy of a Form 3800 as a true and correct copy of the Form 3800 that was in effect in 2001.[20] (Id. at 291-92; see also Pls.' Ex. B). The Form contains an address box to be completed by the mailer. (See Pls.' Ex. B). However, Mr. Mongielo testified that the Form 3800 must not obscure the address that is placed on the article itself. (Tr. at 217).

According to Mr. Palumbo, it was Green Mountain's practice that once the cancellation notice was placed in the mailing envelope, the Form 3800 was affixed to the front of the envelope in such a way as not to obscure the name and address appearing in the window of the envelope. (Id. at 68-69). The detachable receipt portion of the Form 3800 was then placed in the insured's policy file as evidence of the mailing of the cancellation notice. (Id. at 69).

Green Mountain also used the return receipt option provided by the Postal Service. (Id. at 67-68). This required filling out the Postal Service's Form 3811, which contained two boxes: the first box was labeled "Article Addressed to" and the second box listed the "Article Number." (Id. at 232-34; G-M Ex. 1-J). The number placed in the "Article Number" box was the article number

---

[18]Despite testifying that he had been educated in "classes of certified mailer [sic] for the post office" (id. at 80), Mr. Palumbo could not recall whether the Form 3800 that was in effect in 2001 contained a box in which the sender would enter the recipient's address. (Id. at 87-88).

[19]Mr. Mongielo testified that he has been the office manager of the Region 15 office of the National Association of Letter Carriers (National Letter Carriers Union) in New York City for the past three and one-half years, and is also the first Vice President of the New Jersey State Association of Letter Carriers. (Id. at 202).

[20]Mr. Mongielo testified that although the Form 3800 has undergone changes since 2001, the practices and procedures with respect to certified mailing have not changed during that time. (Id. at 214).

14

taken from the Form 3800. (Id. at 233-34).

At the framed issue hearing, Green Mountain did not offer and apparently has not retained the Postal Service Form 3800 used to mail the Notice of Cancellation in this case.[21] Mr. Palumbo explained that, as part of its regular practice in 2001, Green Mountain would only retain the copy of the Form 3800 in the policy file until the signed return receipt Form 3811 was received by Green Mountain, demonstrating that delivery had been made. (Id. at 69-71). At that time, the Form 3800 was removed from the file and discarded. (Id.)

Mr. Palumbo testified that in 2001, Green Mountain's practice was that upon receipt of the Form 3811 showing that the notice had been delivered, the policy file corresponding to the name appearing in the box on the Form 3811 would be pulled. (Id. at 77). If the policy file corresponding to the name on the Form 3811 did not contain a cancellation notice, the clerk would search the suspense files, pull the cancellation notice and then procure the policy file corresponding to that cancellation notice. (Id. at 78-79).

2) Certified Mail Requirement

As noted above, Green Mountain bears the burden of proving that it is in strict compliance with the requirements of the statute. See Meier v. N.J. Life Ins. Co., 101 N.J. 597, 619, 503 A.2d 862, 867 (App. Div. 1986). Here, Green Mountain contends that because it has established that it mailed the Notice of Cancellation to Pro Transport by certified mail, as required by N.J.S.A. § 17:29C-10, under the presumption in the statute, it need not prove actual receipt.

In challenging the presumption of mailing, Mr. Pagan, the owner of Pro Transport,

---

[21]Mr. Luizzi did present the Court with a blank Form 3800. (Pls.' Ex. A).

testified that he never received the Notice of Cancellation that was allegedly sent to Pro Transport. (Tr. at 302-03). According to Mr. Pagan's undisputed testimony, in April 2001, Pro Transport's only office was located at 400 Sip Avenue, Jersey City, New Jersey (the "Jersey City address"), and he was the only person employed by Pro Transport at that time. (Id. at 295-96, 306-07). Thus, he would be the only person to receive and sign for the mail. (Id. at 296-97). Pagan and Pro Transport take the position that the Notice was not properly mailed and in fact was sent to the wrong address.

Indeed, while the Form 3800 used in April 2001 contained a box showing the recipient's address and would provide evidence as to where the Notice was actually shipped, as Mr. Palumbo testified, it was Green Mountain's practice to discard the Form 3800 once the Form 3811 was received. (Tr. at 69-71). Thus, the only evidence presented by Green Mountain to prove mailing in accordance with the statute is the copy of the Notice itself, which contains the Jersey City address for Pro Transport, and the Form 3811, the domestic return receipt, or "green card." (See G-M Ex. 1-J).

The Form 3811, submitted into evidence by Green Mountain, was prepared by a Green Mountain employee prior to delivery of the Notice to the Rutland, Vermont Post Office. (Tr. at 75-76). An examination of the Form 3811 demonstrates that in the box labeled "1. Article Addressed to," the listed address and recipient are: "Pro Tran, Inc., 181 West Ramapo Avenue, Mahwah, N.J. 07430." (G-M Ex. 1-J). In addition, the postmark on the green card is stamped "Mahwah, N.J." (See id.). Mr. Palumbo admitted that in April 2001, Green Mountain had another client, called "Pro Tran Inc.," as distinguished from Pro Transport. (Tr. at 94-95). Pro Tran Inc. operated out of the premises located at 181 West Ramapo, Mahwah, N.J. (Id. at 94).

Moreover, as noted supra, Mr. Pagan testified that his company Pro Transport never operated at the West Ramapo address printed on the green card, nor anywhere in Mahwah, N.J. (Tr. at 295-96). Pro Transport's only premises were located at 400 Sip Avenue, Jersey City, N.J. (Id.) If the Notice of Cancellation was in fact delivered to 181 West Ramapo Avenue in Mahwah, as suggested by the address listed on the green card and as suggested by the postmark, it is clear that Pro Transport would not have received it. (Id.)

Consistent with this inference drawn from the evidence is the fact that on the green card, there is a box labeled "C. Signature," which is where the recipient of the mail is asked to sign to signify receipt of the mail. (Tr. at 96; G-M Ex. 1-J). In this case, the box bears the signature of "J. Gillette" or "J. Gilletto." (G-M Ex. 1-J). Mr. Pagan testified that Pro Transport has never employed any person with a name similar to J. Gillette, nor did he recognize the signature on the green card as resembling that of anyone who worked there. (Tr. at 304-05).

In response to the discrepancies raised by the signature and the address listed on the Form 3811, Green Mountain argues that it is entitled to assume that the mail was properly delivered and that the signature on the Form 3811 was that of a Pro Transport representative, because postal procedure requires that a letter carrier verify "that the person signing for any item was in fact the addressee or a representative of the addressee as stated on the front of the envelope." (Green Mt. Reply Br. at 5 n.3).[22] The logical corollary of this argument is that non-receipt of the Notice of Cancellation due to an improperly stated address would be the result of a disregard of Postal Service procedure by the letter carrier.

---

[22]Citations to "Green Mt. Reply Br." refer to Green Mountain's Brief in Reply to the Response Briefs of Luizzi and Sanchez, filed on April 4, 2007.

Green Mountain's expert, Mr. Mongielo, testified that Post Office regulations require the letter carrier to make a note in section 1D of the Form 3811 if the address on the envelope differs from the address shown in Section 1 of the green card. (Tr. at 265-68). Here, however, Section 1D of the Form 3811 was left blank, indicating that if proper postal procedure was followed, the Postal Carrier did not note any difference between the address on the green card and the address on the envelope. (Id.) Although Green Mountain maintained at the hearing that the address on the Form 3811 was irrelevant and that what governs proper mailing is the address in the window envelope (id. at 233, 235, 236-37), Green Mountain appears to argue that if the Notice was not received, it was because the Post Office erred in relying for delivery purposes on the information contained on the green card, rather than the address in the window envelope. (Green Mt. Reply Br. at 4-6; see also Tr. at 231, 235-37, 244-46). Green Mountain urges the Court to conclude that the letter carrier violated Postal Service regulations in failing to note the alleged discrepancy and thus Green Mountain should not be held responsible for the Postal Service's failure.

While it is possible that the Notice of Cancellation was misdirected through the negligence or failure on the part of Postal Service employees who failed to follow proper procedure, even Green Mountain's Postal Service expert declined to render an opinion supporting that argument. Indeed, as plaintiffs point out in their Post-Hearing Brief, based on Mr. Mongielo's testimony, at least four different Postal Service employees in two different states would have had to have made mistakes for this mail to have been misdirected. Specifically, the employee in Rutland, Vermont, who was responsible for directing the mail to the recipient's local Post Office, would have had to ignore the address indicated in the window envelope and sent the letter in error to Mahwah, N.J. instead of to Jersey City, N.J. (See Tr. at 218, 235, 236, 244-46). The distribution clerk at the

Mahwah Post Office, responsible for separating the item for delivery, would have also had to ignore the address in the window envelope and given it to the accountable clerk. That clerk, in turn, would also have had to ignore the address on the envelope. In addition, another accountable clerk, who was responsible for entering the number of the item in the local Post Office book and then giving it to the letter carrier for delivery, would also have failed to note the discrepancy (see id. at 219-21, 235, 244-46), as would the letter carrier, who delivered it to the Mahwah address. (See id. at 223, 244-46). Furthermore, both the accountable clerk or window clerk who received the signed receipt for processing and the accountable clerk who stamped the green card indicating delivery made on a particular date would, if in fact the address in the window envelope was different, have failed to realize the error. (See id. at 244-46, 262-63). All of these Postal Service employees would have had to ignore the address in the envelope window and processed the mail for delivery to Mahwah, N.J. instead of to the Jersey City address. However, as Mr. Mongielo testified, if the letter carrier from Mahwah realized that the mail was misdirected, he would never deliver the letter to a recipient in Jersey City, nor would a Jersey City resident be required to go to Mahwah to pick up a letter.[23] (See id. at 257-58, 264). Instead, the letter would have been redirected to the Jersey City Post Office for delivery by a letter carrier assigned to that Post Office. (See id.). Mr. Mongielo further testified that it was "highly unlikely" that the Notice would have been delivered and received in Jersey City, but with a Postal Service employee mailing or otherwise delivering the Form 3811 to Mahwah to be stamped. (Id. at 264).

In this case, there is no evidence to suggest that all of these Postal Service employees erred

---

[23]Mr. Mongielo testified that Jersey City has five local Post Offices; Mahwah has only one. (Tr. at 256, 257).

in the course of their duties with respect to this one piece of mail. Rather, the more likely scenario is that the Green Mountain employee responsible for mailing the Notice erroneously addressed the envelope to its other customer, Pro Tran, instead of to Pro Transport. This inference is consistent with the information contained on the green card itself.

New Jersey courts have identified an obligation for the insurer to satisfy the requirements of N.J.S.A. § 17:29C-10 by demonstrating that the notice of cancellation was sent to the correct address of the policy holder. See State v. Hochman, 188 N.J. Super. at 389, 457 A.2d at 1160. In this case, the clear evidence of non-receipt of the Notice of Cancellation, in addition to the testimony regarding Green Mountain's mailing practices and procedures, as well as those of the Postal Service, suggest that the envelope was improperly addressed. In light of the testimony by Green Mountain's postal expert that the Postal Service looks only at the address on the article itself and not to the address on the Form 3800 or on the Form 3811, it would logically follow that either (1) the address in the window envelope was incorrect; or (2) the address on the Form 3800 was incorrect, and (a) the Form 3800 obscured the address on the envelope, or (b) all of the Postal Service employees who handled this letter violated postal regulations by delivering to the address on the Form 3800 instead of the address on the envelope. Having discounted the final option as highly unlikely (see discussion supra at 18-19), this Court notes that in either of the remaining instances, the error lies with the Green Mountain employee who prepared the Notice for mailing, using the wrong address on either the Form 3800, Form 3811, window envelope, or all of the above. In the absence of testimony from the actual employee who could perhaps explain these discrepancies, the Court is constrained to conclude that Green Mountain did not fulfill the requirements of N.J.S.A. § 17:29C-10 by demonstrating that the Notice of Cancellation was

properly sent by certified mail to the correct address of the policyholder.

3) Return Receipt

Plaintiffs and defendant Sanchez raise an additional argument in support of their motion challenging Green Mountain's claim of cancellation. Specifically, they contend that because Green Mountain used the return receipt mailing option, Green Mountain was required to provide a copy of the return receipt signed by the policy holder in accordance with N.J. Stat. Ann. § 17:29C-8 (2007). In support of this contention, they cite certain commentary made in connection with the Senate Labor, Industry and Professions Committee, relating the requirements of N.J.S.A. § 17:29C-8, in which it was noted that: "To be effective, cancellation notices must be sent by certified mail, return receipt requested, and proof of mailing must be accompanied by a return receipt signed by the policy holder." N.J. Stat. Ann. § 17:29C-8 Sen. Lab., Ind. & Professions Comm. Statement (the "Statement"), Assembly No. 1418 L.1980 c. 165.

Indeed, at least one New Jersey court has held that when a notice of cancellation is sent by certified mail, insurers must request a return receipt and provide a copy of the receipt signed by the policyholder with the proof of mailing. See Celino v. General Accident Ins. Co., 211 N.J. Super. at 542-43, 512 A.2d at 498-99 (relying on Statement of the Senate Labor, Industry and Professions Committee's comments on the 1980 amendments to N.J. Stat. Ann. § 17:29C-10).

However, as Green Mountain correctly points out, additional language on the same page of the Statement makes it clear that "[t]he Senate Labor, Industry and Professions Committee amended the bill to eliminate the requirement that cancellation notices sent by certified mail be 'return receipt requested.'" (Green Mt. Reply Br. at 3-4). Therefore, despite the ruling in Celino,

21

the statutory history indicates that the legislature specifically amended N.J.S.A. § 17:29C-10 to eliminate the return receipt requirement.

However, the fact that mailing by return receipt requested is not required by the statute does not negate the undisputed evidence demonstrating that the cancellation notice was delivered to the wrong address. Green Mountain seems to argue that the Court must ignore the return receipt in this case as irrelevant, because it was not required by the statute. However, because Green Mountain resorted to this option in mailing the Notice, the receipt is relevant evidence to be considered by the Court in assessing whether the Notice was mailed to the proper address. In light of the fact that the receipt contains the wrong address and bears a Postal Service stamp indicating that it was processed in the wrong county, the Court finds that under New Jersey law, it is strong evidence against the presumption of proper mailing. See Weathers v. Hartford Ins. Group, 77 N.J. at 235, 390 A.2d at 551; Needham v. New Jersey Ins. Underwriting Ass'n, 230 N.J. Super. at 368, 553 A.2d at 827; Celino v. General Accident Ins. Co., 211 N.J. Super. at 542, 512 A.2d at 499; State v. Hochman, 188 N.J. Super. at 388-89, 457 A.2d at 1160.


4) Certification of Duplicate Copy of Notice

Even assuming that Green Mountain could establish that the Notice was properly mailed in accordance with the statute, it still must prove that it complied with the certification requirement of the statute. In this case, the parties dispute Green Mountain's claim that its certification complied with the statute, noting that: 1) the copy of the certification lacked the date of mailing; 2) was not signed by the person who actually prepared and mailed the Notice; and 3) is not a carbon copy as the certification actually states.

N.J.S.A. § 17:29C-10(b) requires that "the insurer [retain] a duplicate copy of the mailed notice which is certified to be a true copy." The requirement is not an inconsequential aspect of the statute, but rather "a *sine qua non* of an effective cancellation." Celino v. General Accident Ins. Co., 211 N.J. Super. at 541, 512 A.2d at 498 (emphasis in original).

Plaintiffs and defendant Sanchez argue that the certification in this case is defective for a number of reasons. The certification states as follows:

> I hereby certify that I personally mailed in the U.S.
> Post Office, at the place and time stamped hereon, a
> notice of cancellation to the insured . . . an exact
> carbon copy of which appears above, and at said time
> received from the U.S. postal service the receipt
> made a part hereof . . .
>
> Signed this ____ day of _____
> Signature _____

(Ex. G-M 1-H).

A review of the actual certification offered by Green Mountain demonstrates that there are several discrepancies. First, it states that it is "an exact carbon copy," which it clearly is not. Instead, it appears to be an office copy. It is also not dated in the line above the signature line, and instead of an actual signature, the certification appears to have been rubber stamped with the name "Joseph T. Palumbo." (Id.) Green Mountain's witness, Thomas Palumbo, identified the name as that of his father, who he conceded played no role in preparing or mailing the Notice of Cancellation, and who, despite the statement in the Certification, never received a receipt from the Post Office. (Tr. at 85). Plaintiffs argue that the certification fails in this instance because Mr.

Palumbo is not the clerk who actually mailed the notice. (Luizzi Reply Br. at 7).[24]  Green

Mountain, however, did not provide any affidavits or testimony from the clerk who actually

mailed the Notice of Cancellation.  That employee was not called as a witness nor does it appear

that any effort was made to locate him or her. (See Pls.' Reply at 7; Tr. at 132).  Indeed, Palumbo

conceded that, based on the initials "tm," which appeared on defendant's exhibit G-M 1-J, the

Notice of Cancellation was apparently mailed by one of approximately six Green Mountain

employees responsible for preparing certified mail return receipt requested notices of cancellation

in March 2001, none of whom continue to be employed by the agency. (See Tr. at 132).

Although Mr. Palumbo could not identify the former employee who actually prepared and mailed

the Notice, he conceded that, based on the initials "tm" on defendant's exhibit G-M 1-J, he could

have determined who the employee was out of the clerks who were working for Green Mountain

during March, April, and May of 2001. (See Tr. at 98-99).

    Green Mountain contends that even though the certification is undated, is not a "carbon"

copy as it states, and was not actually signed by the person preparing it, the certification

nonetheless complies with the statute.  First, even though it is not a carbon copy, Green Mountain

contends that it is a "true" copy and that is all that N.J.S.A. § 17:29C-10 requires. (Green Mt.

Resp. at 11).[25]  Similarly, Green Mountain argues that although the certification specifically states

that it was signed on a particular day, the fact that the date was not placed on the document is not

relevant because there is no requirement in the statute that the date of certification appear on the

---

[24]Citations to "Luizzi Reply Br." refer to the brief Luizzi submitted in reply to Green
Mountain's Response Brief, filed April 3, 2007.

[25]Citations to "Green Mt. Resp." refer to the Response Brief Green Mountain submitted
in response to the Post-Trial Briefs of Luizzi and Sanchez, filed March 16, 2007.

document. (Id.) Since the "date of mailing," March 29, 2001, appears on the certification and Mr. Palumbo testified that it was Green Mountain's practice to affix the certification to the file copy on the date notice is mailed, Green Mountain argues that this should suffice for purposes of the statute. (Id. at 11-12).

With respect to the stamped signature of Joseph Palumbo, Green Mountain argues that its "long-standing practice" was to use "the stamped signature of the person who counter-signed the policy . . . so that there was symmetry between the signature on the policy and the cancellation document." (Id. at 12). Thus, the clerk who prepared the Notice of Cancellation used the rubber stamp of Joseph Palumbo with his express authority. (Id.) Again, Green Mountain argues that the statute does not require the signature of the person who actually processes the certification but only that the certification is made contemporaneously with the mailing. (Id.)

Citing Public Service Electric & Gas v. Uphold, 316 N.J. Super 168, 719 A.2d 1268 (1998), Green Mountain argues that the absence of a date on the certification is irrelevant and more important, "[p]roper mailing of a notice can be conclusively established through testimony regarding a company's standard practice in preparing and mailing notices." (Green Mt. Post-Hrg. at 10).[26] "The whole point of the requirement is to permit a clerical employee or other custodian of the business record to testify that the file copy is known to be a true copy of the mailed document because the person mailing it so certified at that time." (Green Mt. Resp. at 13 (citing Public Serv. Elec. & Gas v. Uphold, 316 N.J. Super. at 173, 719 A.2d at 1271 (quoting Celino v. General Accident Ins. Co., 211 N.J. Super. at 543, 512 A.2d at 499))). Green Mountain

---

[26]Citations to "Green Mt. Post-Hrg." refer to the Post-Trial Brief submitted by Green Mountain, filed February 14, 2007.

argues that not only is it irrelevant that the person mailing the certification did not sign it or date it but the fact that it contained extraneous language that was also not pertinent to this mailing does not render the certification "inaccurate." (Id. at 14).

This Court disagrees. The certification requirement is critical to the statutory scheme set forth in Section 17:29C-10 because it allows the insurer to point to the file copy of the Notice to demonstrate compliance with the statute notice requirements. As the court in <u>Public Service Electric & Gas v. Uphold</u> noted, "[t]he added weight of the evidence thus afforded to the file copy is therefore clearly dependent on a contemporaneous certification. A certification made later would be hardly more than an in-house version of standard-practice proof." 316 N.J. Super. at 173, 719 A.2d at 1271. Although Green Mountain would have the Court assume that the certification was made contemporaneously with the mailing, in the absence of the testimony of the actual employee who performed the mailing or even a date when the certification was allegedly made, all the Court has to rely on is in fact "an in-house version of standard-practice proof," which is clearly insufficient. See id.

To the extent that Green Mountain relies on <u>Public Service Electric & Gas v. Uphold</u>, the case is distinguishable. In that case, the insured did not contest receipt of the Notice; it merely challenged the technical compliance of the certification. The court, in excusing the absence of a date on the certification, specifically stated: "[b]ecause [the insured] never denied receiving [the insurer's] notice of cancellation . . . there is no material dispute of fact as to receipt. We conclude that the statute does not control." <u>Public Serv. Elec. & Gas v. Uphold</u>, 316 N.J. Super. at 170, 719 A.2d at 1269.

Courts have held that the certification requirement is not met in the absence of testimony

by "an employee . . . who could attest that the copy of the notice was in fact a copy of the notice actually mailed to decedent and loss payee, that the notices were mailed in envelopes corresponding to the post office certificates, and that the addresses were correct." Celino v. General Accident Ins. Co., 211 N.J. Super. at 544, 512 A.2d at 500. Additionally, certification is insufficient when it is "not based upon personal knowledge and [the record] is entirely devoid of evidence pertaining to [the insurer's] practices and procedures." Lopez v. New Jersey Auto. Full Ins. Underwriting Ass'n, 239 N.J. Super. at 24, 570 A.2d at 999. Although Mr. Palumbo was clearly competent to testify about Green Mountain's practices and procedure,[27] since he developed the policies and practices involved in mailing the notices, when, as here, there is an issue as to whether a specific notice was properly mailed, personal testimony from the employee with *actual knowledge* of the mailing is desired. See Needham v. New Jersey Ins. Underwriting Ass'n, 230 N.J. Super. at 372, 553 A.2d at 829. Such testimony could shed light on whether Pro Transport's Jersey City address was correctly written on the 3800 Form, and whether its address was present in the window envelope. In this case, the absence of personal testimony from the employee actually charged with mailing the cancellation notice, when combined with the discrepancies apparent in the mailing address on the Form 3811 and the testimony of non-receipt by the policyholder, raises a factual issue as to whether or not the notice was properly mailed. See id.

Given that it is Green Mountain's burden to prove strict compliance with the statute, the

---

[27]According to Palumbo, Green Mountain's policy and practice was to retain a certified, exact duplicate copy of the Notice of Cancellation for its records. (Tr. at 48-49). Duplicate copies are certified by "the clerk who processes the cancellation and actually issues the documentation." (Tr. at 49). This clerk does not sign the notice, but "use[s] the stamp of whatever individual's name appears on the policy for counter signature purposes. That individual give [sic] authority to that person's user stamp." (Id. at 49).

Court concludes that Mr. Palumbo's testimony is not sufficient to show that a certified, duplicate copy of the Notice of Cancellation was retained pursuant to N.J.S.A. § 17:29C-10(b). See Lopez v. New Jersey Auto. Full Ins. Underwriting Ass'n, 239 N.J. Super. at 24, 570 A.2d at 999; Cwiklinski v. Burton, 217 N.J. Super. at 510-11, 526 A.2d at 273-74; Celino v. General Accident Ins. Co., 211 N.J. Super. at 542-43, 512 A.2d at 498-99. Therefore, the Court concludes that Green Mountain failed to comply with N.J.S.A. § 17:29C-10(b) with respect to the certified duplicate copy retention requirement.

### 5) Federal Motor Carrier Administration Regulation § 387.7(b)(1)

Plaintiffs also urge the Court to find that the Notice of Cancellation failed to comply with the timing requirements of the Federal Motor Carrier Regulations.

The United States Department of Transportation, Federal Motor Carrier Administration Regulation, Part 387, codified as 49 C.F.R. § 387 (the "Regulation"), governs the minimum levels of financial responsibility for motor carriers. It was conceived with the intention of creating incentives for "motor carriers [to] maintain an appropriate level of financial responsibility for motor vehicles operated on public highways." 49 C.F.R. § 387.1 (2008). Pro Transport falls within the purview of Section 387 because it was transporting property by use of a motor vehicle in interstate commerce. See 49 C.F.R. § 387.3 (2008).

Subsection (b)(1) of the Regulation provides guidelines for the cancellation of insurance issued to motor carriers subject to Section 387. It provides, *inter alia*, that "[c]ancellation may be effected by the insurer or the insured motor carrier giving 35 days' notice in writing to the other. The 35 days' notice shall commence to run from the date the notice is mailed. Proof of mailing

shall be sufficient proof of notice." 49 C.F.R. § 387.7(b)(1) (2008).

Plaintiffs argue that the insurance policy issued by State National to Pro Transport was not effectively cancelled under Section 387.7(b)(1) because Green Mountain failed to provide mailed Notice of Cancellation to Pro Transport within the 35-day window set forth in Section 387.7(b)(1). (Luizzi Trial Br. at 25). In response, Green Mountain has submitted two exhibits showing that the Federal Motor Carrier Safety Administration ("FMCSA"), which handles the regulation of motor carriers under Section 387, considered the policy effectively cancelled. The first is an "Insurance Acceptance Report," created in response to a submission by Reliant American Insurance Co. (G-M Ex. 1-I). According to Thomas Palumbo, this Report is a receipt showing that the FMCSA "accepted the request to cancel the [insurance policy]." (Id.; Tr. at 46). The second exhibit is a screenshot of an FMCSA website showing Pro Transport's Insurance History, which shows that the insurance policy issued by State National was, according to the FMCSA, cancelled on May 3, 2001. (G-M Ex. 4).

However, regardless of what the FMCSA's records indicate, there must also be a showing that the Notice of Cancellation was actually mailed within 35 days of the effective date of cancellation. See 49 C.F.R. § 387.7(b)(1). See Barbarula v. Canal Ins. Co., 353 F. Supp. 2d 246, 254 (D. Conn. 2004); Northland Ins. Co. v. New Hampshire Ins. Co., 63 F. Supp. 2d 128, 134 (D.N.H. 1999). The Notice of Cancellation sent by Green Mountain lists May 3, 2001 as the effective date that Pro Transport's insurance policy was to be cancelled. (G-M Ex. 1-H). Therefore, under Section 387.7(b)(1), notice must have been mailed to Pro Transport no later than March 29, 2001. (See Luizzi Trial Br. at 25). In support of its claim that the Notice was mailed on March 29, 2001 in compliance with the Regulation, Green Mountain cites the date of mailing

29

printed on the cancellation document itself and the signed certification. While this is the same date listed as the date of mailing on the Notice (see G-M Ex. 1-H), it has been established that Mr. Palumbo's certification was a rubber stamp, and Green Mountain has offered no personalized evidence from the actual mailer of the notice as to the date the notice was actually mailed. Furthermore, as noted supra, the date of certification on the cancellation notice was left blank, raising a question as to whether the Green Mountain clerk actually complied with internal procedures and mailed the Notice on the date indicated at the top of the certification. (G-M Ex. 1-H).

This uncertainty is compounded by the fact that the Form 3811, the return receipt on record, shows a postmark indicating that the Notice was processed at the Mahwah, N.J. Post Office on April 25, 2001. (G-M Ex. 1-J). According to the testimony of Green Mountain's expert witness, Frank Mongielo, the person who received the Notice of Cancellation signed for the letter on April 25 or the day before. (Tr. at 286). Taking into account the postal expert's testimony that in April 2001, it generally took between one and three days for mail to be delivered from Rutland, Vermont to either Mahwah or Jersey City, New Jersey and that delivery would occur between two to four days from mailing (Tr. at 249-51), it seems unlikely that it was mailed on March 29, 2001 and delivered twenty-seven days later. Instead, the evidence suggests that the Notice could not have been mailed on March 29, 2001 as urged by Green Mountain, but rather was mailed in late April, 2001.

Since Green Mountain failed to retain the Form 3800 certified mail receipt, which would conclusively show when the package was mailed, the Court concludes that Green Mountain has not satisfied its burden of establishing that the Notice was in fact mailed on March 29, 2001.

Although the practice and procedure as outlined by Mr. Palumbo raises the presumption that the

Notice of Cancellation was mailed on March 29, 2001, as discussed earlier, without personalized

testimony or an affidavit from the clerk who actually mailed the notice, the evidence is

insufficient to overcome the contrary evidence that demonstrates the Notice was processed in

Mahwah, N.J. on April 25, 2001. Accordingly, the Court finds that Green Mountain failed to

comply with the 35-day notice requirement of 49 C.F.R. § 387.7(b)(1).


6) Unearned Premium

Plaintiffs also argue that even if Green Mountain complied with both the requirements of

the Regulation and New Jersey statutory requirements, Green Mountain's failure to provide a

refund of Pro Transport's unused policy premium renders the cancellation ineffective. (Luizzi

Trial Br. at 23-24).

Under Section A, paragraph 5, of the policy at issue, the insurer is obligated to refund a

certain portion of the premiums paid in the event of cancellation. Specifically, the Common

Policy Conditions provisions states:

> If this policy is cancelled, we will send the first Named Insured any
> premium refund due. If we cancel, the refund will be pro rata. If
> the first Named Insured cancels, the refund may be less than pro
> rata. The cancellation will be effective even if we have not made or
> offered a refund.

(Id., Ex. 2). The first part of this provision of the policy is consistent with the general rule that the

return of unearned premiums is a condition precedent to cancellation of an insurance policy. The

Second Circuit applied this general rule in the absence of specific caselaw, stating: "[t]he general

rule is that return of unearned premiums is a condition precedent to cancellation of an insurance

policy . . . except where the insurance contract specifies otherwise." Arkwright-Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co., 887 F.2d 437, 440-41 (2d Cir. 1989) (internal citations omitted).[28] The court explained that the rationale for the rule is that "a failure to refund an unearned premium could leave an insured individual without funds to purchase new insurance and allowing cancellation without a refund would be harsh." Id. at 441. However, the provision also clearly states that the cancellation will be effective regardless of whether a refund is made or offered.

New Jersey Statute Annotated § 17:29C-4.1, which addresses the return of unearned premiums, does not explicitly address whether a failure to refund renders cancellation of a policy ineffective. Rather, the statute assesses a penalty of 5% of the gross unearned premium when a refund does not occur within 60 days of cancellation. See N.J. Stat. Ann. § 17:29C-4.1 (2007). The relevant language states: "[w]henever an insurance policy or contract is canceled, the insurer on notice thereof shall return to the insured, within a reasonable time not to exceed 60 days of cancellation or notice, . . . the amount of gross unearned premiums paid." N.J. Stat. Ann. § 17:29C-4.1 (2007). While it is unclear from the language of the statute whether a failure to refund any unearned premium negates the cancellation of a policy, the caselaw is clear "that, upon cancellation of an insurance contract by either party to it, the obligation rests on the insurer to pay to the insured the unearned premium called for by the terms of the policy." Spilka v. South America Managers, Inc., 54 N.J. at 464, 255 A.2d at 761 (internal citations omitted); see also Bankers' Indem. Ins. Co. v. Henry Henkel & Sons, 118 N.J. Eq. 244, 251, 178 A. 565, 568 (N.J.

---

[28]Although the court in Arkwright-Boston was looking to North Carolina law, the opinion is still instructive on the rationale behind the policy and its application in the case where the policy language explicitly provides for such a refund.

32

Ch. 1935) (holding that "'when the company seeks cancellation or rescission, it must, as a condition of obtaining relief, do equity by returning or tendering back the premium paid, with interest") (quoting Corpus Juris, 1269 § 475).

In this case, Pro Transport was entitled to receive $628.50, representing the "unused portion of the premium previously paid." (Luizzi Tr. Br. at 23). Green Mountain has presented no evidence that this refund was ever paid. However, the insurance policy in this case provides that cancellation will be effective regardless of whether unearned premiums are refunded. While the Second Circuit has stated that the return of unearned premiums is necessary for effective cancellation of an insurance policy unless the policy specifies otherwise, Arkwright-Boston Mfrs. Mut. Ins. Co. v. Calvert Fire Ins. Co., 887 F.2d at 440-41, the court was applying the "general rule" in that case, not New Jersey law, which applies in this case.

Under New Jersey law, it is clear that an insurer is obligated to refund any unearned premiums upon cancellation, Spilka v. South America Managers, Inc., 54 N.J. at 464, 255 A.2d at 761; Bankers' Indem. Ins. Co. v. Henry Henkel & Sons, 118 N.J. Eq. at 251, 178 A. at 568, but it is not clear that cancellation is ineffective if unearned premiums are not refunded. Although finding that there is "something inherently inequitable in allowing an insurer to terminate present coverage for which it has already been paid on the ground that it has not yet been paid for future coverage which it is not yet obliged to provide," a New Jersey superior court did not specify that cancellation is ineffective if unearned premiums are not refunded. Harvester Chem. Corp. v. Aetna Cas. & Sur. Co., 277 N.J. Super. 421, 429, 649 A.2d 1296, 1300 (App. Div. 1994); see also Davidson v. German Ins. Co. of Freeport, ILL., 74 N.J.L. 487, 490, 65 A. 996, 997 (N.J. 1907) (where policy did not specify that cancellation would be effective regardless of whether unearned

33

premiums were refunded, the Supreme Court of New Jersey reversed the trial court's decision that a refund was due at the time of cancellation). Rather, N.J.S.A. § 17:29C-4.1 already provides for a remedy for failure to refund unearned premiums: the statute assesses a penalty of 5% of the gross unearned premium when a refund does not occur within 60 days of cancellation. See N.J. Stat. Ann. § 17:29C-4.1 (2007).

Therefore, it may be irrelevant that Green Mountain failed to refund the unearned premiums. Not only does it appear that failure to refund unearned premiums does not preclude cancellation under New Jersey law, but the insurance policy issued by Green Mountain specifically provides that cancellation will be effective whether or not any unearned premiums are refunded. (Luizzi Trial Br., Ex. 2). However, the fact of non-payment raises additional questions as to the validity of the cancellation. While Green Mountain may be correct that a failure to return the unearned premiums upon cancellation of the policy does not itself preclude cancellation, the Court does not need to reach this question because the failure of Green Mountain to properly address the Notice of Cancellation renders the cancellation ineffective as of the time of the accident.

## CONCLUSION

For the aforementioned reasons, the Court finds that the insurance policy issued by State National Insurance Company to Pro Transport was not properly cancelled by Green Mountain Agency, and, thus was in effect on September 21, 2001, the date of plaintiff's accident.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      February 25, 2008

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York