UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ROBERT LUIZZI and JOSEPHINE LUIZZI,

                Plaintiffs,

      - against -

PRO TRANSPORT, INC. and LUIS SANCHEZ,

                Defendants,
-----------------------------------------------------------------X
LUIS SANCHEZ,

           Defendant/Third Party Plaintiff,

      - against -

STATE NATIONAL INSURANCE COMPANY,

              Third Party Defendant,
-----------------------------------------------------------------X
STATE NATIONAL INSURANCE COMPANY,

            Second Third Party Plaintiff,

      - against -

GREEN MOUNTAIN AGENCY, INC.,

            Second Third Party Defendant.
-----------------------------------------------------------------X

**MEMORANDUM
AND  O R D E R**

02 CV 5388 (CLP)

      In this coverage action brought by State National Insurance Company ("State National")

against Green Mountain Agency, Inc. ("Green Mountain"), State National seeks a declaration

that Luis Sanchez ("Sanchez") and Pro Transport, Inc. ("Pro Transport") were covered by Pro

Transport Insurance Policy Number RPJ006802 ("the Policy") and its corresponding

endorsements for the accident giving rise to the underlying action in this case. (S.N. Mem.[1] at 2). Green Mountain argues that State National did not sustain its burden of proving:[2] (1) that the Sanchez vehicle qualifies as a "covered auto" under the Policy, pursuant to either Symbol 8 ("hired auto" coverage) or Symbol 9 ("non-owned auto" coverage); or (2) that coverage is available pursuant to the Policy's MCS-90 Endorsement. (See G.M. Mem.[3] at 2). Green Mountain contends that because there was no coverage under the Policy for the underlying accident, Green Mountain owes no duty to indemnify State National for the amounts paid in settlement. (G.M. Trial Mem.[4] at 1).

For the reasons set forth below, the Court finds that State National has sustained its burden by proving by a preponderance of the evidence that the Sanchez vehicle qualifies as a "covered auto" pursuant to the Policy and that the Policy provided coverage to both Pro Transport and Sanchez for the underlying action in this case. Additionally, the Court holds that State National acted in accordance with the terms of its Policy in settling the underlying action.

## PROCEDURAL HISTORY

On September 22, 2001, the automobile owned and operated by Robert Luizzi came into

---

[1]Citations to "S.N. Mem." refer to the State National Insurance Company Post Trial Brief on the Issue of Insurance Coverage, filed on January 17, 2012.

[2]State National concedes that it bears the burden of establishing coverage in this action. (See S.N. Mem. at 2).

[3]Citations to "G.M. Mem." refer to Second Third-Party Defendant Green Mountain Agency, Inc.'s Post-Trial Brief on Coverage, filed on March 6, 2012.

[4]Citations to "G.M. Trial Mem." refer to Second Third-Party Defendant Green Mountain Agency, Inc.'s Trial Memorandum of Law Addressing Coverage, filed on November 8, 2011.

contact with a 1985 International tractor-trailer[5] driven by Luis Sanchez, in Queens, New York ("the Luizzi-Sanchez accident" or "the accident"). (Luizzi Compl.[6] ¶¶ 6-8; S.N. Mem. at 3; Tr.[7] at 137; G.M. Mem., Ex. 61). On September 25, 2002, plaintiffs Robert and Josephine Luizzi ("the Luizzis") filed a negligence action in New York State Supreme Court against Sanchez and Pro Transport, a hauling company that hired owner-operator truckers, such as Sanchez, to conduct its hauls. (S.N. Mem. at 3; Luizzi Compl. ¶ 9; Tr. at 61, 70-71). The Luizzis sought to recover for personal injuries suffered as a result of the accident. (Luizzi Compl. ¶¶ 10, 14, 15).

On October 4, 2002, Sanchez filed a Notice of Removal to this Court and filed an Answer to the Complaint on October 17, 2002. Also on October 17, 2002, Sanchez asserted a cross-claim against Pro Transport.[8] On June 17, 2007, the parties consented to the jurisdiction of the undersigned, and on December 22, 2004, Pro Transport filed its Answer to the Luizzi Complaint. In its Answer, Pro Transport asserted a cross-claim against Sanchez, alleging that Pro Transport did not at any time own, operate, control, or lease either the tractor or the trailer involved in the

---

[5]In his Complaint, Luis Sanchez alleges that it was a 1998 International tractor that was involved in the Luizzi-Sanchez accident. (See Third-Party Complaint filed by defendant Sanchez on June 3, 2005 ("Sanchez Compl." ¶ 14)). However, the vast majority of papers submitted in this matter state that the tractor was a 1985 model.

[6]Citations to "Luizzi Compl." refer to the Complaint, filed by Robert and Josephine Luizzi in Kings County, Supreme Court of the State of New York, on September 25, 2002.

[7]Citations to "Tr." refer to the transcript of the trial held by this Court on November 14 and 17, 2011.

[8]Initially, Pro Transport failed to answer or otherwise respond to plaintiffs' Complaint and Sanchez's cross claims. Accordingly, on May 13, 2003, plaintiffs filed a motion for default judgment against Pro Transport. On May 19, 2003, the Clerk of the Court entered a notation of default. However, during a conference held before this Court on September 16, 2004, Pro Transport appeared with counsel, and the parties agreed that the default previously entered against Pro Transport should be vacated.

Luizzi-Sanchez accident.  (P.T. Ans.[9] ¶ 19).

On June 3, 2005, Sanchez filed a Third Party Complaint, naming State National as a defendant.  Sanchez alleged that on March 9, 2001, Green Mountain, as insurance wholesaler and agent for State National (S.N. Compl.[10] ¶¶ 11, 12, 15, 16, 20), issued the Policy to Pro Transport, which covered "scheduled, hired, and non-owned autos operated on behalf of or in the business of Pro Transport."  (Sanchez Compl. ¶¶ 29, 30).[11]  Sanchez asserted that under the Policy, State National and Pro Transport owe a duty to defend, indemnify, and hold Sanchez harmless for any judgments or awards stemming from the Luizzi-Sanchez accident.  (Id. ¶¶ 31, 32, 33).  On July 29, 2005, State National filed its Answer to Sanchez's Third Party Complaint, claiming as an affirmative defense that "any policy of insurance . . . issued to the defendant . . . was cancelled in a timely and proper manner prior to the date of the alleged accident."[12]  (S.N. Ans.[13] at 6).

On February 9, 2006, State National filed a Second Third Party Complaint against Green Mountain, claiming that:  (1) if the Policy was not cancelled properly, it was due to the negligence of Green Mountain; and (2) Green Mountain breached its contract with State National

---

[9] Citations to "P.T. Ans." refer to the Verified Answer with Cross-Claims, filed by Pro Transport on December 22, 2004.

[10] Citations to "S.N. Compl." refer to the Second Third-Party Complaint, filed by State National on February 9, 2006.

[11] Sanchez's Third Party Complaint also named One Beacon Insurance Company d/b/a General Accident Insurance Company ("One Beacon") as a defendant.  However, One Beacon was dismissed from this action on February 8, 2006.

[12] The reason for the alleged cancellation of the Policy was the undisputed fact that Pro Transport had failed to pay the premium on the Policy.  (See this Court's February 25, 2008 Order ("2/25/08 Order" at 5), filed on February 26, 2008).

[13] Citations to "S.N. Ans." refer to the Verified Answer to Third Party Complaint, filed by State National on July 29, 2005.

when Green Mountain failed to properly cancel the Policy.[14]  (S.N. Compl. ¶¶ 29, 33-36).  On

August 8, 2006, Green Mountain filed an Answer to State National's Second Third-Party

Complaint.  In its Answer, Green Mountain asserted that the Policy was "cancelled in a timely

and proper manner prior to the date of the alleged accident . . . ."  (G.M. Ans.[15] ¶ 43).

On January 17 and 18, 2007, this Court held a framed issue hearing to determine whether

the Policy had been properly cancelled due to Pro Transport's non-payment of premiums.  On

February 25, 2008, the Court found that, due to an error on the part of Green Mountain, the

Policy had not been properly cancelled by Green Mountain, and thus, was in effect on the date of

the Luizzi-Sanchez accident.  (See 2/25/08 Order[16] at 35).

On March 13, 2009, State National filed a Motion for Summary Judgment against Green

Mountain, claiming that Green Mountain was liable to State National for not properly cancelling

the Policy because State National claimed it was foreseeable that State National would be

harmed by Green Mountain's failure to cancel the Policy.  (S.N. Sum. Judg.[17] ¶¶ 18-20).  State

National also claimed that it was entitled to damages as a third party beneficiary of the contract

between Reliant American Insurance Company ("Reliant"), State National's agent in the

administration of the Policy, and Green Mountain.  (Id. ¶¶ 11, 21-23).

---

[14]State National claims that it filed its Third Party Complaint against Green Mountain on February 6, 2006.  (S.N. Mem. at 3-4).  Although the Complaint is dated February 6, 2006, it does not appear to have been filed until February 9, 2006.

[15]Citations to "G.M. Ans." refer to the Second Third-Party Answer, filed by Green Mountain on August 8, 2006.

[16]Citations to "2/25/08 Order" refer to the Memorandum and Order issued by this Court on February 25, 2008.

[17]Citations to "S.N. Sum. Judg." refer to the Affirmation in Support of the Motion for Summary Judgment, filed by State National on April 3, 2009.

On August 2, 2010, the Court granted Green Mountain's Motion for Summary Judgment with respect to State National's contract claim, but denied both parties' motions with respect to State National's negligence claim, finding that there were material issues of fact in dispute as to "whether it was foreseeable to Green Mountain that its failure to properly cancel [the Policy] would result in economic injury to State National." (8/02/10 Order[18] at 18, 34).

On October 27, 2011, the Luizzis settled their action for $1.1 million, discontinuing with prejudice their claims against both Sanchez and Pro Transport. Of the total settlement amount, State National paid $800,000, which it now seeks to recoup from Green Mountain based on Green Mountain's negligent failure to properly cancel the insurance policy.[19] (S.N. Reply at 17-18). The question currently before the Court is whether the Policy, which was in effect on the day of the Luizzi-Sanchez accident, provided coverage to Pro Transport and/or Sanchez for the Luizzi-Sanchez accident.

After weighing the evidence presented at the trial that was held on November 14 and 17, 2011, and after considering the briefs submitted by the parties following the trial, the Court finds that State National has proven by a preponderance of the evidence that the Sanchez vehicle was a "covered auto" and that the Policy provided coverage to both Pro Transport and Sanchez for the underlying accident.

<u>TRIAL TESTIMONY</u>

---

[18]Citations to "8/02/10 Order" refer to the Memorandum and Order issued by this Court on August 2, 2010.

[19]The remaining $300,000 was paid by Connecticut Indemnity Insurance, which separately insured Sanchez. (<u>See</u> State National Insurance Company Post Trial Reply Brief on Issue of Insurance Coverage, filed April 10, 2012 ("S.N. Reply" at 17-18)).

6

At the time of the Luizzi-Sanchez accident, Pro Transport was in the business of facilitating hauls of, among other items, recyclable materials such as newspaper and cardboard. (Tr. at 61). In February of 2001, Vincente Pagan ("Pagan"),[20] the owner and principal of Pro Transport, discussed insurance coverage for Pro Transport with a representative from Garden State Brokers ("Garden State"). (Id. at 96-97, 105). Garden State, acting as a commercial insurance underwriter for Green Mountain, was "authorized by Green Mountain to execute insurance contracts, collect premiums, and provide all usual and customary services of an insurance agent" on Green Mountain's behalf. (See S.N. Sum. Judg., Ex. N). Garden State submitted the completed application from Pro Transport for the Policy to Green Mountain. (Tr. at 29-30).

## I. The Policy

### A. Palumbo's Testimony

Thomas J. Palumbo, a 30% owner and Executive Vice President of Green Mountain, testified that Green Mountain was an insurance wholesaler, specializing in trucking insurance, garage policies, and contractor insurance. (Tr. at 5-7). As Executive Vice President, Palumbo was responsible for back office operations, maintenance of records, and the negotiation of contracts with new carriers. (Id. at 6). Palumbo identified State National's Exhibit 10 as the Policy issued to Pro Transport by Green Mountain, bearing Number RPJ006802. (Id. at 8-9; S.N. Ex. 10). Palumbo testified that the application for the Policy is part of Exhibit 10. (Tr. at 9-10).

---

[20]Both State National and Green Mountain spell Pagan's first name "Vincent," rather than "Vincente." However, since the official transcript from the trial before this Court spells Pagan's first name "Vincente" (see Tr. at 60), the Court uses the latter without taking a position on the matter.

According to Palumbo, the Policy's application, which was submitted to Green Mountain, consisted of an ACCORD 125, which is a form that consists of a general information section, a section about the truckers to be hired, and a vehicle schedule. (Id. at 10-11). The application information section of the ACCORD 125 submitted on behalf of Pro Transport includes Pagan's signature and is dated February 27, 2001. (Id. at 11; see also S.N. Ex. 10).

On the second page of the application is a box with a series of "yes" and "no" questions about the applicant's business, to be answered by the insured. (Tr. at 11-12). Palumbo testified that, in general, Green Mountain would not issue a policy unless the questions were answered, and that Green Mountain relies on the answers in determining what kind of policy to issue. (Id.) Palumbo testified that because different truckers have different kinds of businesses, the underwriting of a policy may be simple or it may require Green Mountain to go through additional steps, depending on the answers provided in the ACCORD 125. (Id.)

Question 9 of the ACCORD 125 asks whether the applicant hires equipment from others; on the Pro Transport Policy application, this question is answered in the negative. (Id. at 13). Question 12 asks whether other truckers operate under the applicant's permit; that question is also answered in the negative on the application. (Id.) According to Palumbo, Pro Transport made no disclosure on its application that it hired, leased, or borrowed autos from others. (Id.) Palumbo testified that had the application indicated that Pro Transport utilized hired, leased, or borrowed vehicles, the premium would have been impacted. (Id. at 25-27). Green Mountain's due diligence also would have increased because it would have asked for information about those vehicles and their drivers and/or owners. (Id.)

On cross-examination, Palumbo testified that Reliant, not Green Mountain, acted as

8

underwriter of the Policy.[21] (Id. at 28-29). Palumbo conceded that although the Policy application was signed by Pagan, the answers in the boxes were not initialed and there is no information indicating where the information came from, although Palumbo stated that this is "standard industry practice." (Id. at 30). When asked, Palumbo testified that the only way Green Mountain is able to verify the information in the application is through the retail broker (here, Garden State), and Palumbo stated that he did not know if any steps were taken to verify the information included in this Policy application. (Id. at 31-32). Palumbo also testified that the coverage offered and the premium charged is based primarily upon Garden State's request and the information that it provides. (Id. at 34).

Palumbo identified the Common Policy Declaration included in the Policy application, which lists the name of the insured – Pro Transport, Inc. – and contains a business description: "Trucker – food stuff and general freight." (Id. at 13-14; see also S.N. Ex. 10). On the Business Auto Coverage Form Declaration ("Business Auto Coverage Form" or "BAC Form"), there is a column entitled "Coverages." (Tr. at 15; S.N. Ex. 10 at 6-7). Under "Coverages," the term "Liability" appears first on the form. (Tr. at 15). Below that term is the phrase "Covered Autos," which refers to the vehicles that are to be covered by the Policy. (Id.) The BAC Form lists three types of "Covered Autos," demarcated as Symbols 7, 8, and 9. (Id.)

Palumbo testified that the only auto listed under Symbol 7, which is defined as "specifically described autos," is a 1986 Mack tractor, with a vehicle identification number ending in GC014423. (Id. at 17). Symbol 8 covers "hired autos only" and is defined as:

---

[21] According to State National, State National entered into an agreement with Reliant to write insurance policies in New York and in New Jersey on State National's behalf. (S.N. Compl. ¶ 13). Green Mountain had an agreement with Reliant to issue policies on behalf of State National and Reliant. (Id. ¶ 12; see also Tr. at 5).

> Only those autos you lease, hire, rent[,] or borrow.  This does not
> include any auto you lease, hire, rent[,] or borrow from one of your
> employees, partners (if you are a partnership), members (if you are
> a limited liability company)[,] or members of their household.

(S.N. Ex. 10 at 8; Tr. at 18).  Symbol 9 covers "non-owned autos," which are defined as:

> Only those autos you do not own, lease, hire, rent[,] or borrow that
> are used in connection with your business.  This includes autos
> owned by employees, partners (if you are a partnership), members
> (if you are a limited liability company)[,] or members of their
> households but only while used in your business or your personal
> affairs.

(Tr. at 18; S.N. Ex. 10 at 8).

Palumbo further testified that there also was a Truckers Endorsement, which replaced the

Policy's definition of "insured," that read:

> The owner or anyone else from whom you hire or borrow a
> covered auto that is not a trailer while the covered auto is being
> used exclusively in your business and is being used pursuant to
> operating rights granted to you by a public authority.

(Tr. at 19).  According to Palumbo, the Truckers Endorsement definition of "insured" defines the

term "covered auto" in the same way as the Policy itself.  (Id. at 20).

In explaining the requirement in the Truckers Endorsement that the auto "is being used

pursuant to operating rights granted to you by a public authority," Palumbo testified that the term

"public authority" refers to the Federal Motor Carrier Safety Administration ("FMCSA").  (Id. at

20-24).  Palumbo interpreted the phrase "being used exclusively in your business as a trucker" as

meaning that "the covered auto would be in the care, custody[,] and control of the insured."  (Id.

at 21).  In other words, Palumbo testified that his understanding was that the phrase indicated that

the vehicle is under the "[e]xclusive control" of the policyholder.  (Id.)

According to Palumbo, the Policy did not originally include a MCS-90 Endorsement,

10

which Palumbo explained contemplates coverage for vehicles that are not listed in the motor

carrier's insurance policy but that are being used by truckers on the motor carrier's behalf. (Id. at

22).  According to Palumbo, the MCS-90 Endorsement is required by the federal government to

be included in the type of policy at issue in this case, and that it was later added to the Policy.

(Id. at 21, 35).

Palumbo testified that his understanding of MCS-90 Endorsements is that an insurer

agrees to pay "within the limits of liability described herein any final judgment recovered against

the Insured for public liability resulting from negligence in the operation, maintenance[,] or use

of motor vehicles subject to the financial responsibility requirements of Section 29, and 30 of the

Motor Carrier Act of 1980."[22] (Id. at 22; S.N. Ex. 10 at 50).

Palumbo testified that the MCS-90 Endorsement contains a reimbursement provision

under which "the insured agrees to reimburse the Company for any payment made by the

Company on account of any accident claim or suit involving a breach of the terms of the policy . .

. ." (Tr. at 24; S.N. Ex. 10 at 50).  Palumbo testified that it was his understanding that this

Endorsement is only applicable when a judgment is entered against the motor carrier. (Id. at 22).

B.  Pagan's Testimony

Pagan testified that he did not recall seeing the insurance application before he signed it;

however, he stated that he did give information to Garden State. (Id. at 96-97).  According to

Pagan, Harry D'Bosco from Garden State told Pagan that the Policy covered not only Pagan's

own vehicle, but additionally, that it covered vehicles driven by independent owner-operators

---

[22]During this portion of Palumbo's testimony, he asked and was allowed to read directly
from the MCS-90 Endorsement included in the Policy. (See Tr. at 22).

11

hired by Pro Transport to conduct hauls on its behalf.[23]  (Id. at 101-02).


## II.  Pro Transport's Operating Authority

Green Mountain called M. Thomas Ruke as an expert witness to render an opinion on the

issue of Pro Transport's operating authority at the time of the Luizzi-Sanchez accident.  (Id. at

38-43).  Ruke testified that he is the owner/manager of an "insurance business consultancy,"

which does consulting work for insureds and insurance companies.  (Id. at 43).

According to Ruke, the FMCSA, which regulates motor carriers engaged in interstate

commerce, describes a "motor carrier" as "the user of a commercial vehicle 10,001 GVW[24] or

larger involved in interstate or foreign [commerce]."  (Id. at 45).  Ruke testified that, based on his

review of this matter, Pro Transport was a "for-hire motor carrier," obligated to obtain authority

from the FMCSA to conduct hauls.  (Id. at 46).  Ruke testified that after examining the FMCSA

website,[25] it appears that Pro Transport was first granted "motor property contract carriage" on

---

[23]According to Pagan's testimony, all of the drivers hired by Pro Transport owned their
own trucks, with the exception of Edwin Mendez; Pagan testified that Mendez was a driver for
Pro Transport but that he did not own his own truck.  (See Tr. at 67-68).

[24]According to Ruke, "GVW" is an abbreviation for "gross vehicle weight," which takes
into account "the weight of the truck, the driver, [and] the load."  (Tr. at 45).  In other words,
according to Ruke, GVW stands for "[t]he whole thing fully loaded and fully gassed."  (Id.)

[25]Green Mountain Exhibit 41 consists of a printout from the FMCSA website, which
appears to have been accessed on January 19, 2007.  Although there was some dispute at trial
regarding the admissibility of this document, the Court ultimately admitted the document into
evidence as a public record.  (See Tr. at 208).  The Court found that it was self-authenticating as
an official publication.  (See id.).  Nonetheless, because it is unclear to the Court whether the
entire document has been provided and what, exactly, the document indicates, the Court affords
it very little weight in deciding this matter.

April 1, 1997.[26]  (Id. at 51).  The website indicates that Pro Transport's operating authority was revoked on March 1, 1999, was reinstated on March 10, 2005, and was then revoked again on December 19, 2005.  (Id.)  Mr. Ruke testified that the FMCSA website therefore suggests that Pro Transport had no operating authority pursuant to the FMCSA on September 22, 2001, the date of the accident.  (Id.)

However, on cross examination, Ruke conceded that insurance coverage information for a motor carrier itself is not listed on the FMCSA website.  (Id. at 54).  Rather, the FMCSA reflects whether motor carriers have met the FMCSA's financial requirements.  (Id. at 54).  Ruke explained that in order for a motor carrier to be granted operating authority, the motor carrier must complete an OP-1 form.  (Id. at 54-55).  Once that OP-1 form has been submitted and approved, the motor carrier's insurance company – or another entity that can provide the required information – must then file a Form 91-X on the motor carrier's behalf.  (Id. at 56-57).  It is only once the Form 91-X has been accepted and approved by the FMCSA that a motor carrier may then validly operate pursuant to the FMCSA; it is this financial responsibility information – rather than the initial operating rights granted by the FMCSA – that is posted on the FMCSA website.  (Id.)

III.  Relationship Between Pro Transport and Sanchez

A.  Pagan's Testimony

Contrary to the representations made on the Pro Transport application for insurance, Pagan testified that 70% of the loads handled by Pro Transport were hauled by self-employed,

---

[26]Ruke used the term "motor property contract carriage" in his testimony without providing a definition.

13

independent owner-operators. (<u>Id.</u> at 66). In speaking to the nature of the relationship between owner-operators and Pro Transport, Pagan testified that Pro Transport did not require the owner-operators to submit any formal written application to obtain hauling jobs, and he stated that he did not recall having formal contracts with Pro Transport owner-operators. (<u>Id.</u> at 72). Pagan testified that Pro Transport owner-operators regularly worked for other trucking firms as well. (<u>Id.</u> at 74). Further, Pagan stated that Pro Transport did not maintain the vehicles of the owner-operators, did not ask for driving records or require drug tests of its owner-operators, and did not supply decals to demarcate vehicles that were hauling for Pro Transport. (<u>Id.</u> at 73-74). In fact, Pagan testified that many of the vehicles that hauled for Pro Transport had logos from other trucking firms on them. (<u>Id.</u> at 74).

With respect to Sanchez, Pagan testified that he could not recall exactly when Sanchez began hauling for Pro Transport, but that Sanchez worked "on and off" for Pro Transport. (<u>Id.</u> at 76). Pagan explained that Sanchez "hauled [for Pro Transport] for a couple of months and [then would] go somewhere else and [then would] come back [when] he needed more work." (<u>Id.</u>) Although Pagan initially could not recall the vehicle that Sanchez drove, after being prompted by counsel, Pagan stated that Sanchez had a 1985 International truck. (<u>Id.</u>) Consistent with Pro Transport's general practice, Pagan testified that Pro Transport did not maintain or pay for the maintenance of the Sanchez vehicle; Sanchez was responsible for paying his own tolls, inspections, and permits, and Pro Transport did not monitor Sanchez's maintenance of his truck in any way. (<u>Id.</u> at 85). Additionally, Pagan testified that Pro Transport did not require Sanchez to submit an employment application or motor vehicle records, nor was Sanchez required to submit to drug testing. (<u>Id.</u> at 86).

14

According to Pagan, Pro Transport did not require its owner-operators to take specific routes, call en route, or prepare end-of-trip reports. (Id. at 75, 82). Pagan stated that the only instruction he usually gave owner-operators for a haul was a pick-up and a drop-off location. (Id. at 82). He stated that, generally, the only paperwork owner-operators submitted was a bill of lading that was prepared by the company for which the haul was done. (Id. at 75-76, 82). Pagan testified that no set compensation for owner-operators existed because the owner-operators were paid by the load. (Id. at 71-72). Pagan noted that he did not believe that Pro Transport had a written agreement with Sanchez relating to compensation; Pagan explained that, like the other owner-operators, Sanchez was paid by check for each completed haul. (Id. at 88). At the end of the year, according to Pagan, all owner-operators, including Sanchez, received an IRS Form 1099, which is intended for independent contractors. (Id. at 72, 88).

In terms of decals or other forms of identification for the Sanchez vehicle, Pagan claimed that Pro Transport did not provide or request that Sanchez place any such identifying materials on the Sanchez vehicle. (Id. at 86-87). Pagan further testified that he did not recall being told that Sanchez had placed a Pro Transport decal or identification number on the Sanchez vehicle. (Id. at 87).

B. Sanchez's Testimony

Consistent with Pagan's testimony, Sanchez testified that, at the time of the Luizzi-Sanchez accident, he owned a 1985 International tractor and that he paid for the vehicle's maintenance, plus any required tolls, inspections, and permits. (Id. at 137, 167, 189). Sanchez also stated that he was a self-employed owner-operator, and that he received a 1099 tax form from Pro Transport. (Id. at 179-80).

15

However, several aspects of Sanchez's testimony differed from that of Pagan. For example, Sanchez testified that he was working exclusively for Pro Transport at the time of the accident. (Id. at 138-39). Additionally, Sanchez stated that he was under the impression that Pro Transport provided insurance both to him and to his vehicle when his vehicle was connected to a Pro Transport trailer. (Id. at 144). Similarly, Sanchez claimed that his truck had its own specific parking space (id. at 168), while Pagan asserted that he did not know where Sanchez parked the vehicle.[27] (Id. at 87). Sanchez stated that Pagan would make a physical inspection of Sanchez's vehicle when Sanchez returned from a haul. (Id. at 168). Sanchez also suggested that although he believed himself to be an independent owner-operator, "[i]t is possible that [he] was renting the truck from Pro Transport." (Id. at 180).

Sanchez further contradicted Pagan's testimony by testifying that Pro Transport did, in fact, put its identification numbers on Sanchez's vehicle; Sanchez identified these numbers while on the witness stand, after being shown photographs of his vehicle. (Id. at 144-45). Sanchez identified other numbers on his truck as well, however, and testified that over the years he had worked for other carriers and had put their MC numbers on his truck, too. (Id. at 146). Sanchez observed that the words "Transport Inc." appeared on the door of his truck but the "Pro" portion of "Pro Transport Inc." had worn off. (Id. at 147). According to Sanchez, the Pro Transport MC number was also on his vehicle at the time of the accident. (Id. at 148). However, on cross examination, Green Mountain's counsel suggested that "Transport Inc." referred to another trucking company, TMT Transport, Inc., rather than Pro Transport. (Id. at 170-71, 177-78).

---

[27]Sanchez did testify, however, that he was not always required to park his vehicle in the designated parking spot, and that "[i]f the parking lot was full, it had to be parked somewhere else." (Tr. at 168).

16

When Green Mountain's counsel asked if Sanchez was aware of a New Jersey motor carrier named TMT Transport, Inc. though, Sanchez answered in the negative.  (Id. at 171).[28]

## IV.  The Lease Agreement

### A.  Pagan's Testimony

Initially, Pagan stated that he did not have "written arrangements" with any of the owner-operators with whom he worked, nor did he recall owner-operators requesting such agreements.  (Id. at 72).  However, later in his testimony, Pagan admitted that he had entered into lease arrangements with owner-operators on occasion, upon their request.[29]  (Id. at 79).  Pagan testified that all owner-operators, including those with written agreements, only received the drop-off and pick-up locations for their hauls.  (Id. at 81-82).  Pagan testified that Pro Transport did not provide the owner-operators with any additional instructions regarding their work and that these owner-operators were not required to place any Pro Transport decals on their vehicles.  (Id.)  Pagan further stated that he had no expectation of exclusivity with the owner-operators, including those with whom he had lease agreements.  (Id. at 81).  Rather, according to Pagan, owner-operators who had written agreements with Pro Transport worked "from time-to-time" for other motor carriers, regardless of what was set forth in the agreements.  (Id. at 81, 108).

The Lease Agreement ("the Agreement") between Sanchez and Pro Transport, which was entered into evidence by Green Mountain as Exhibit Number 44, appeared to be for a one-year

---

[28]When counsel attempted to refresh Sanchez's recollection about whether he had worked for TMT Transport, Inc., Sanchez testified that the document provided to him by counsel did not, in fact, refresh his recollection of the issue.  (Tr. at 178).

[29]Pagan testified that he recalled two or three owner-operators requesting such lease agreements in 2000-2001.  (Tr. at 79-80).

term (i.e. through the time of the accident).  (See S.N. Ex. 44).  The Agreement provided:

> Louis Sanchez is an Owner Operator.  We [Pro Transport] provide
> a permanent Lease Agreement for one year providing that he is
> under our Exclusive use and control.  We provide Liability
> Insurance while he is hooked to a container, and he is responsible
> for his own when in Bobtail Condition.

(S.N. Ex. 44).  Although Sanchez stated affirmatively that it was Pagan who signed the

Agreement with Sanchez on behalf of Pro Transport (Tr. at 140), Pagan questioned whether he

was the Pro Transport representative who entered into the Agreement with Sanchez.[30]  (Id. at 83).

However, Pagan failed to suggest who else would have signed the Agreement, and it is unclear

whether there were even any other employees at Pro Transport with such signing authority at the

time.  (See generally id. at 83).  Pagan stated that he understood owner-operators to want such

lease agreements because it enabled them to obtain less expensive "bobtail" insurance.[31]  (Id. at

79).

On cross examination, Pagan explained that he assumed Sanchez and the other owner-

operators who performed hauls for him also worked for other transportation companies because

they did not work for Pro Transport on a full-time basis.  (Id. at 112, 120).  Pagan testified that

Sanchez explicitly informed Pagan that he was working for other motor carriers at the time he

---

[30]Pagan admitted that the handwriting and signature on the Lease Agreement may have
been his: "Yes, it could be mine.  I'm not sure but it could be."  (Tr. at 83).  When asked if it
was someone else's writing, Pagan equivocated, stating:  "It could be.  I'm not sure if it's mine or
someone else's."  (Id.)  He concluded by stating, "I'm not sure if I signed this or not.  I really
don't remember.  I might have."  (Id.)

[31]"Bobtail" insurance refers to insurance where coverage is limited "only to those
instances where the tractor is being used without the trailer and is not being operated in the
business of an authorized carrier."  See Moore v. Nayer, 321 N.J. Super. 419, 423, 729 A.2d 449,
452 n.2 (N.J. Super. Ct. App. Div. 1999) (citing Prestige Cas. Co. v. Michigan Mut. Ins. Co., 99
F.3d 1340 (6th Cir. 1996)).

was working for Pro Transport. (Id. at 121). The Court notes, however, that this testimony was contradicted by Pagan's deposition testimony, where he stated that he did not know whether Sanchez hauled for a company other than Pro Transport; no one had ever informed him that Sanchez was hauling for a company other than Pro Transport; and he had no information that would lead him to believe Sanchez was hauling for a company other than Pro Transport. (See id. at 126-27 (discussing Pagan Dep.[32] at 128)). When Pagan was given the opportunity to contradict that testimony on cross examination, Pagan stated that he did not recall giving such testimony at his deposition. (Id. at 127).

B.  Sanchez's Testimony

Sanchez testified that there were some periods of time during which he hauled for "various companies," but he insisted that he hauled exclusively for Pro Transport during the period of the Agreement. (Id. at 170, 138-39). Sanchez testified that he believed he could not have driven for Pro Transport without entering into the Agreement, and that his understanding of the Agreement was that Pagan would lease Sanchez the truck and that Sanchez "would work for [Pagan] under the banner of his company." (Id. at 164). However, when asked later in his testimony if he hauled for other companies during the time of the Agreement, Sanchez said he did not remember; when pressed, he said that he did not know. (Id. at 181).


V.  The Luizzi-Sanchez Accident

Sanchez testified that he was hauling a load of recycled paper and cartons for Pro

--------

[32]Citations to "Pagan Dep." refer to the deposition of Vincente Pagan, taken on September 26, 2006.

Transport on September 22, 2001 when the Luizzi-Sanchez accident occurred.[33]  (Id. at 141-42,

185).  Sanchez testified that Pagan called him the day before, on September 21, 2001, to provide

him with the pick-up and drop-off locations for the haul.  (Id. at 142).  Although Sanchez could

not recall the specific locations for the September 22, 2001 haul, Sanchez testified that this

information would have been part of the "dispatch" from Pagan.  (Id. at 186).

     Sanchez could not recall what time the Luizzi-Sanchez accident occurred, but he

estimated that it occurred sometime in the afternoon on September 22, 2001.[34]  (Id. at 187).

Sanchez also claimed that he tried calling Pagan after the accident, but "the telephone was off or

he didn't pick up."  (Id.)  Sanchez claimed that he told Pagan of the accident when he brought the

bill of lading to him the following Monday, and that he was paid for the haul by check the week

after the accident.  (Id. at 190).  Sanchez testified that he no longer had a copy of the check.  (Id.)

     Pagan testified that he "might have" asked Sanchez to perform a haul for Pro Transport

on September 22, 2001, but that he did not remember whether he had, in fact, hired Sanchez to

perform such a haul on that date.  (Id. at 91).  Although Pagan recalled giving Rapid Recycling

work to Sanchez at points throughout their professional relationship, he could not recall the exact

dates of those jobs.  (Id. at 91-92).

     In contrast to Sanchez's account, Pagan denied that Sanchez informed him of the

accident, testifying that he had not learned about the accident until he was sued almost a year

after the accident occurred.  (Id. at 93).  Pagan stated that although he thoroughly searched Pro

---

[33]Sanchez allegedly was hired by Pro Transport to haul recycled materials for Rapid
Recycling.  (See S.N. Mem. at 19-20).

[34]According to the police report, the accident actually occurred at approximately 8:00 a.m.
on September 22, 2001.  (See the Police Accident Report, G.M. Ex. 43).

Transport's records, he was unable to find any document suggesting that Sanchez performed a haul for Pro Transport on the date of the accident.[35] (Id. at 93-94). Pagan testified that he could not remember whether he had a bill of lading showing a Rapid Recycling haul completed on September 22, 2001, but testified that he did not believe any such bill of lading ever existed. (Id. at 100-01).

## DISCUSSION

Unlike the majority of cases raising coverage issues, in this case, there is no dispute between the parties to the Policy that the Policy provided coverage to both Sanchez and Pro Transport for the Luizzi-Sanchez accident. Both the insured, Pro Transport, and the insurer, State National, agree that given the failure to properly cancel the Policy, the Policy was in effect at the time of the accident and coverage for the Sanchez vehicle was provided under the Policy. Only Green Mountain, which is neither a signatory to the Policy nor the party providing coverage, has challenged the insurance company's interpretation of its own Policy language.

Green Mountain sets forth two alternative theories in support of its claim that it need not indemnify State National for the sum State National paid to settle the underlying action. (See

---

[35]In its Trial Memorandum, Green Mountain argued: "Pagan testified that it was Pro Transport's practice to keep pertinent job related records such as payroll records, trip records, job lists[,] and bills of lading," but that "no records including any bill of lading or record of payment to Sanchez for a September 22, 2001 Rapid Recycling job were ever produced by Pro Transport. . . . In addition, no documents from Rapid Recycling or the Port of Newark were ever produced showing that the Rapid Recycling job actually took place, as a Pro Transport job or otherwise." (G.M. Trial Mem. at 5-6) (emphasis omitted). However, Pagan testified that his office had been vandalized following the Luizzi-Sanchez accident, and although Pagan found some bills of lading, he did not find any associated with "a Rapid Recycling job that took place on September 28, 2001." (Tr. at 100). The Court notes, however, that this statement was made in the context of an inquiry about the Luizzi-Sanchez accident that undisputably occurred on September 22, 2001.

G.M. Mem. at 2).  First, Green Mountain argues that neither Pro Transport nor Sanchez are

covered by the Policy and that, even if either or both were covered, State National was not

"legally obligated" to provide coverage.  (Id. at 2-3).  Green Mountain also argues that an

alternative source of coverage, the MCS-90 Endorsement, does not provide coverage in this case,

and that even if it did, the settlement reached by State National did not constitute a "final

judgment," as is required.  (Id.)


I.  Choice of Law for Policy Interpretation

     In analyzing the provisions of the Policy, the Court must first determine which law to

apply.  Since this diversity action was commenced in New York, the Court looks to choice of law

rules applicable in the forum state of New York.  See International Chemical Corp. v. Nautilus

Ins. Co., No. 09 CV 359, 2012 WL 32963, at *3 (W.D.N.Y. Jan. 6, 2012); O'Neill v. Yield

House, Inc., 964 F. Supp. 806, 809 (S.D.N.Y. 1997).

     New York courts apply the "grouping of contacts" or "center of gravity" choice of law

test for determining the applicable law to be applied in a contract case, and more specifically in

an insurance contract case.  O'Neill v. Yield House, Inc., 964 F. Supp. at 809; see also

International Chemical Corp. v. Nautilus Ins. Co., 2012 WL 32963, at *3 (stating that "New

York courts 'traditionally resolve [] choice of law issues . . . by applying the law of the state

which the parties understood would be the principal location of the risk'") (quoting Snyder v.

National Union Fire Ins. Co., 688 F. Supp. 932, 934-35 (S.D.N.Y. 1998)).  The purpose of this

analytical approach to choice of law questions was explained by the New York Court of Appeals

in Zurich Insurance Co. v. Shearson Lehman Hutton, Inc. as establishing "which State has 'the

22

most significant relationship to the transaction and the parties.'"  84 N.Y.2d 309, 317, 642

N.E.2d 1065, 1069, 618 N.Y.S.2d 609, 612 (1994) (quoting Restatement [Second] of Conflict of

Laws § 188[1])).  Looking to the state with the most significant relationship gives the place

having the most interest in the problem control over the legal issues and allows for the

application of the policies of the jurisdiction with the greatest concern in the outcome of the

litigation.  See In the Matter of the Liquidation of Midland Ins. Co., 16 N.Y.3d 536, 543-44, 947

N.E.2d 1174, 1178-79, 923 N.Y.S.2d 396, 400-01 (2011).

     The New York Court of Appeals, in Zurich Insurance Co. v. Shearson Lehman Hutton,

Inc., set out a number of factors that New York courts look to in applying the "grouping of

contacts" test:  (1) "the place of contracting," (2) the place of "negotiation and performance," (3)

the "location of the subject matter" of the contract, and (4) "the domicile or place of business of

the contracting parties."  84 N.Y.2d at 317, 642 N.E.2d at 1068, 618 N.Y.S.2d at 612 (quoting in

part and citing in part Restatement [Second] of Conflict of Laws § 188[1]-[2]).

     When determining the law governing an insurance policy that covers risks in multiple

states, New York courts look to the "principal location of the insured risk."  Steadfast Ins. Co. v.

Sentinel Real Estate Corp., 283 A.D.2d 44, 50, 727 N.Y.S.2d 393, 398 (3d Dep't 2001); see also

O'Neill v. Yield House, Inc., 964 F. Supp. at 809 (noting that "in the 'special subset of contracts

that involves insurance, [New York courts] will apply the local law of the state which the parties

understood was to be the principal location of the insured risk . . . unless with respect to the

particular issue, some other state has a more significant relationship under the principles state[d]

in [Section] 6 [of the Restatement] to the transactions and the parties'") (quoting Zurich Ins. Co.

v. Shearson Lehman Hutton, Inc., 84 N.Y.2d at 318, 642 N.E.2d at 1069, 618 N.Y.S.2d at 613)

(internal citations omitted).  In Certain Underwriters at Lloyd's London v. Foster Wheeler Corp., the court held that "[t]he state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk." 36 A.D.3d 17, 24, 822 N.Y.S.2d 30, 35 (1st Dep't 2006), aff'd, 9 N.Y.3d 928, 929, 844 N.Y.S.2d 773, 773 (2007); see also In the Matter of the Liquidation of Midland Ins. Co., 16 N.Y.3d at 544, 947 N.E.2d at 1179, 923 N.Y.S.2d at 401.  In affirming this approach, the New York Court of Appeals stated that since the insured's domicile is known at the time the contract of insurance is entered into and since that is the law "most likely to conform to [the contracting parties'] expectations," adoption of this approach will likely result in "certainty, predictability[,] and uniformity of result."  Certain Underwriters at Lloyd's London v. Foster Wheeler Corp., 36 A.D.3d at 23, 822 N.Y.S.2d at 30 (quotation marks and internal citations omitted).

Applying these principles, the Court finds that in the instant case, the law of the State of New Jersey should apply to the Court's interpretation of the Policy.  Not only was the Policy entered into in New Jersey, but Pro Transport is domiciled in New Jersey and it was clear to the contracting parties that New Jersey was the principal location of the risk.

## II.  Federal Trucking Policies

Before analyzing the specific provisions of the Policy, a brief review of the federal statutes and regulations that govern the interstate commercial trucking industry is necessary to provide context for the Court's analysis.  See, e.g., Connecticut Indem. Co. v. Podeszwa, 392 N.J. Super. 480, 484-85, 921 A.2d 458, 461 (N.J. Super. Ct. App. Div. 2007) (referring to federal law in analyzing a bobtail insurance policy).

"In the past, the use by truckers of leases or borrowed vehicles led to a number of abuses that threatened the public interest and the economic stability of the trucking industry." Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co., 868 F.2d 357, 362 (10th Cir. 1989) (citing American Trucking Ass'ns v. United States, 344 U.S. 298, 304-05 (1953)).  Many of the lessors "had poor equipment and limited financial capacity," Cox v. Bond Transp., Inc., 53 N.J. 186, 197, 249 A.2d 579, 585 (1969), and because "[u]nscrupulous carriers used leased vehicles to avoid safety regulations," Harris v. Mitchell, 358 N.J. Super. 504, 508, 818 A.2d 443, 445 (N.J. Super. Ct. App. Div. 2003), this practice "led to abuses which threatened the trucking industry and public safety." Moore v. Nayer, 321 N.J. Super. at 428, 729 A.2d at 454 (citing Prestige Cas. Co. v. Michigan Mut. Ins. Co., 90 F.3d at 1342 (6th Cir. 1996)); see also American Trucking Ass'ns v. United States, 344 U.S. at 304-05.  The use of leased vehicles also created "public confusion as to who was financially responsible for the vehicles." Prestige Cas. Co. v. Michigan Mut. Ins. Co., 90 F.3d at 1342 (citations omitted); see also Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co., 868 F.2d at 363.  In Cox v. Bond Transportation, Inc., the New Jersey Supreme Court observed that:  "There can be no doubt that the [Interstate Commerce Commission ("ICC")] regarded the trip-leasing arrangement as a device which made it difficult for a member of the public injured by the operation of a vehicle so leased to fix carrier responsibility." 53 N.J. at 200-01, 249 A.2d at 586.

Accordingly, Congress amended the statutory scheme to give the ICC the power to regulate non-owned equipment used by interstate carriers in an attempt to "remedy that evil." Id. at 201, 249 A.2d at 586. (citations omitted).[36]  The regulations enacted by the ICC required

---

[36]While Congress initially authorized the ICC to regulate vehicles leased by motor carriers, see Harris v. Mitchell, 358 N.J. Super. at 508, 818 A.2d at 445, the ICC Termination Act

interstate motor carriers to be fully responsible for the operation of certified vehicles in order to protect the public from the adverse consequences of the trucking industry's frequent use of leased or borrowed vehicles." Moore v. Nayer, 321 N.J. Super. at 428, 729 A.2d at 454 (citing Ryder Truck Rental Co. v. UTF Carriers, Inc., 719 F. Supp. 455, 457 (W.D. Va. 1989), aff'd, 907 F.2d 34 (4th Cir. 1990)). The regulations were designed to "ensure that a financially responsible party would be available to compensate a third party injured in a collision with an ICC carrier." Griffin v. Public Ser. Mut. Ins. Co., 327 N.J. Super. 501, 507, 744 A.2d 204, 207 (N.J. Super. Ct. App. Div. 2000) (citing American Trucking Ass'ns v. United States, 344 U.S. at 304-05).

The law was intended to "prevent interstate carriers from avoiding the consequences of injuries suffered by 'members of the public using the highways.'" Harris v. Mitchell, 358 N.J. Super. at 509, 818 A.2d at 446 (emphasis in original) (quoting Cox v. Bond Transp., Inc., 53 N.J. at 203, 249 A.2d at 589). Motor carriers were required under the regulations to "obtain minimum levels of financial responsibility and to file a certificate of insurance with the ICC." Griffin v. Public Serv. Mut. Ins. Co., 327 N.J. Super. at 507, 744 A.2d at 207 (citing 49 C.F.R. §§ 387.7, 387.301); see also Moore v. Nayer, 321 N.J. Super. at 429, 321 N.J. Super. at 454-55. Thus, "policy limitations or even violations of an insurance agreement by the insured [would] not relieve the insurance company of liability for a judgment against the motor carrier." Griffin v. Public Serv. Mut. Ins. Co., 327 N.J. Super. at 507, 744 A.2d at 207.

---

of 1995 ("ICCTA") abolished the ICC and "transferred most of its responsibilities to the Secretary of Transportation." Department of Transp. v. Public Citizen, 541 U.S. 752, 759 n.1 (2004) (citing ICC Termination Act of 1995, § 101, 109 Stat. 803); see also Emerson Elec. Supply Co. v. Estes Express Lines Corp., 451 F.3d 179, 183 (3d Cir. 2006). Thereafter, "[i]n 1999, Congress transferred responsibility for motor carrier safety within DOT to [the] FMCSA." Department of Transp. v. Public Citizen, 541 U.S. at 759 n.1.

III.  Principles of Contract Construction

Under New Jersey law, an insurance policy must "'be read as a whole and construe[d] . . . according to the plain meaning of its terms.'"  C.H. Heist Caribe Corp. v. American Home Assurance Co., 640 F.2d 479, 481 (3d Cir. 1981).  Where the terms of an insurance contract are clear and unambiguous, they must be given their "'plain and ordinary meaning.'"  See Ambrosio v. Affordable Auto Rental, Inc., 307 N.J. Super. 114, 704 A.2d 572, 575 (N.J. Super. Ct. App. Div. 1998).  However, ambiguities in an insurance contract must be construed "in a light most favorable to the insured and consonant with the insured's objectively reasonable expectations."  Powell v. Alemaz, Inc., 335 N.J. Super. 33, 39-40, 760 A.2d 1141, 1144 (N.J. Super. Ct. App. Div. 2000) (citations omitted).  Indeed, because insurance companies are experts in their field and unilaterally prepare their policies, "when called on to interpret insurance policies," courts must "assume a particularly vigilant role in ensuring their conformity to public policy and principles of fairness."  Progressive Cas. Ins. v. Hurley, 166 N.J. 260, 272-73, 765 A.2d 195, 201 (2001) (internal quotation marks and citations omitted); see also Agricultural Ins. Co. v. Scott, No. 00 CV 2114, 2001 WL 253880, at *3 (E.D. Pa. March 14, 2001) (explaining that courts interpreting insurance policies under New Jersey law broadly construe coverage provisions, narrowly read exclusionary provisions, resolve ambiguities in favor of an insured, and try to interpret the policy so as to further "the insured's reasonable expectations") (quoting Search EDP, Inc. v. American Home Assurance Co., 267 N.J. Super. 537, 542, 632 A.2d, 286, 289 (N.J. Super. Ct. App. Div. 1993)).

New Jersey courts have tended to liberally construe coverage requirements in the context of motor vehicle accidents; the state's own insurance scheme "evinces a strong legislative policy

of assuring at least some financial protection for innocent accident victims." <u>Proformance Ins.</u>

<u>Co. v. Jones</u>, 185 N.J. 406, 414-15, 887 A.2d 146, 151-52 (2005) (citing cases and noting that

where an insurance policy contains a provision that is "contrary to the public policy of mandating

coverage on every vehicle for the benefit of injured parties," New Jersey courts have interpreted

the policy to exclude such a provision).  Similarly, New Jersey courts have held that where a

policy fails to contain endorsements required by the FMCSA, the policy "is deemed as a matter

of law to incorporate them." <u>Casey v. Selected Risks Ins. Co.</u>, 176 N.J. Super. 22, 30-31, 422

A.2d 83, 87 (N.J. Super. Ct. App. Div. 1980) (citing cases and noting that the endorsements

required by federal law "modif[y] the usually applicable principles of state insurance law").

In <u>Casey v. Selected Risks Insurance Co.</u>, the court held that an insurance company was

required to pay for the injuries of a third party involved in an accident with a tractor-trailer even

though the insured had failed to comply with certain notice requirements under the policy.  176

N.J. Super. at 31, 422 A.2d at 87-88.  The court explained that a member of the public injured by

a tractor-trailer insured under a federally certified policy "may recover under the policy even if

the insured breaches the notice provision or some other provision of the policy which would

ordinarily bar recovery." <u>Id.</u> at 30-31, 422 A.2d at 87.  The court held that such coverage

"furthers the intention of the ICC law and regulations . . . [to] protect members of the public by

providing them with an identifiable and financially accountable source of compensation for

injuries caused by leased or owned tractors or trailers." <u>Id.</u> at 31, 422 A.2d at 88.

However, in disputes concerning coverage responsibilities as between two insurance

carriers, New Jersey courts have held that the federal policy of protecting the public does not

apply and that "'ICC considerations are not determinative.'" <u>Carolina Cas. Ins. Co. v. Insurance</u>

28

Co. of N. Am., 595 F.2d 128, 138 (3d Cir. 1979) (quoting Allstate Ins. Co. v. Liberty Mut. Ins.
Co., 368 F.2d 121, 125 (3d Cir. 1976)).  Thus, while FMCSA regulations may "alter the terms of
the insurance agreement when the protection of the public is at stake," the regulations do not
affect a dispute between insurance companies, and in such a circumstance, the court should
instead "consider the express terms of the parties' contracts."  Id. at 138 (citing Allstate Ins. Co.
v. Liberty Mut. Ins. Co., 368 F.3d at 125).


IV.  Coverage Under the Policy Provisions

       The Policy, which was issued by Green Mountain to Pro Transport, initially became
effective on March 9, 2001, and was effective for a one-year term that was set to expire on March
9, 2002.  (See S.N. Mem. at 16).  This Court previously determined that despite State National's
desire to cancel the Policy prior to the accident, the Policy was in effect at the time of the Luizzi-
Sanchez accident.  (See 2/25/08 Order).

       Turning to the specific potential sources of coverage under the Policy, the Business Auto
Coverage Form, CA 00010797, explains the Policy's terms.[37]  (See S.N. Ex. 10).  According to
the BAC Form, State National agreed to:

              [P]ay all sums an "insured" legally must pay as damages because
              of "bodily injury" or "property damage" to which this insurance
              applies, caused by an "accident" and resulting from the ownership,
              maintenance[,] or use of a covered "auto[.]"

(Id.)  In this case, there is no dispute that the incident between Sanchez and Luizzi was an
"accident," nor is there any dispute that Mr. Luizzi suffered bodily injury as a result of the

---

       [37]State National states that "[c]overage is provided under a Business Auto Coverage Form
(ISO form CA 00010797)[,] as modified by a Truckers Endorsement (ISO form CA 23200797),
and subject to the Business Auto Coverage Form Declarations."  (S.N. Mem. at 14).

accident.  Rather, the primary issue in dispute with respect to the Policy is whether Sanchez

and/or Pro Transport qualify as an "insured," as the term is used in the BAC Form, and

additionally, whether State National was "legally [required to] pay" damages for the underlying

action.  Each of these issues will be considered in turn.

A.  Meaning of the Term "Insured"

Although "insured" is defined in the Policy itself, Pro Transport obtained a Truckers

Endorsement that replaced the definition of who qualifies as an "insured" under the Policy.  (S.N.

Mem. at 15; Tr. at 19).  According to the terms of the Truckers Endorsement (see discussion

infra at pp. 60-67), Pro Transport qualifies as an "insured" and may receive coverage, but only if

the Sanchez vehicle is a "covered auto" as defined in the Policy.  (See S.N. Ex. 10).  Similarly,

Sanchez may qualify to receive coverage under the Truckers Endorsement, but only if his vehicle

is first determined to be a "covered auto."  Thus, the Court first turns to this threshold question.

B.  Definition of a "Covered Auto"

The term "covered auto" is defined by the Business Auto Coverage Form.  (See S.N.

Mem. at 14).  According to the BAC Form, an auto is a "covered auto" if it meets the

requirements of either Symbol 7, Symbol 8, or Symbol 9 of the BAC Form.  (Id. at 15).  Since it

is clear that the Sanchez vehicle is not listed in the Policy, and because State National appears to

concede that Symbol 7 coverage is not available, the question is whether the Sanchez vehicle

qualifies as a "covered auto" under either Symbol 8 or Symbol  9.

C. Symbol 8 Coverage

Symbol 8, which deals with "Hired Autos Only," provides coverage to the following

vehicles:

30

> Only those "autos" you lease, hire, rent[,] or borrow.  This does not
> include any "auto" you lease, hire, rent[,] or borrow from any of
> your "employees," partners (if you are a partnership), members (if
> you are a limited liability company)[,] or members of their
> households.

(S.N. Ex. 10).  According to this definition, the Sanchez vehicle may be deemed a "covered auto"

pursuant to Symbol 8 if the following requirements are met:  (1) Pro Transport leased, hired,

rented, or borrowed the Sanchez vehicle; and (2) Sanchez does not qualify as an "employee."

    1)   Whether Sanchez Qualifies as an Employee

     As a preliminary matter, the Court finds for purposes of Symbol 8 coverage that Sanchez

was not an "employee" of Pro Transport.  Based upon the evidence presented in this case,

Sanchez was an independent owner-operator who was self-employed; Sanchez hired out his

services and his vehicle to haul loads for Pro Transport and for other hauling services.  (Tr. at 70-

71, 74).  According to Pagan, 70% of Pro Transport's loads were hauled by independent owner-

operators (id. at 66), and Sanchez hauled for Pro Transport "on and off."  (Id. at 76).  Similarly,

Sanchez testified that he was a self-employed owner-operator.  (Id. at 179-80).  He stated that he

received a 1099 tax form – used for independent contractors – from Pro Transport.  (Id. at 179-

80).  The Lease Agreement between Sanchez and Pro Transport specifically refers to Sanchez as

"an Owner Operator" (S.N. Ex. 44), and the parties do not appear to dispute that there were

periods of time when Sanchez hauled for other companies.

     Accordingly, based on the evidence, the Court finds that for purposes of Symbol 8

coverage, which expressly excludes vehicles owned by "employees," Sanchez was an

independent contractor, rather than an "employee," of Pro Transport.[38]

    2)  <u>Whether the Sanchez Vehicle was Leased, Rented, Hired, or Borrowed</u>

State National asserts that the Sanchez vehicle qualifies as a "hired auto" because the Sanchez vehicle was hired by Pro Transport pursuant to the Lease Agreement, and Sanchez was hauling for Pro Transport at the time of the accident. (S.N. Mem. at 19-20, 23). In support of this assertion, State National cites the following: (1) Sanchez's "unwavering" testimony that he was hauling for Pro Transport at the time of the accident; (2) the existence of a Lease Agreement in effect at the time of the accident, stating that Sanchez would haul exclusively for Pro Transport; (3) Pagan's testimony acknowledging that Sanchez sometimes performed hauls on Pro Transport's behalf for Rapid Recycling; and (4) photographs of the Sanchez vehicle depicting the motor carrier ("MC") number assigned to Pro Transport and a decal on the door of the Sanchez vehicle that said "Transport, Inc." (Id.)

Green Mountain responds by arguing first that there is insufficient evidence to prove that Sanchez was engaged in a job for Pro Transport at the time of the accident. (G.M. Mem. at 16-18). Green Mountain further argues that the Lease Agreement was not valid and that in order for Symbol 8 coverage to apply, there must be a separate contract between Pro Transport and Sanchez "whereby the vehicle is hired or leased to [Pro Transport] for its exclusive possession, use[,] and control." (Id. at 18). Finally, Green Mountain argues that in addition to a valid lease

---

[38]State National argues that Sanchez was a "statutory employee" for purposes of determining Symbol 9 coverage (see State National Insurance Company Post Trial Reply Brief on Issue of Insurance Coverage, filed with the Court on April 10, 2012 ("S.N. Reply") at 11-13), and in the context of determining who qualifies as an insured under the Truckers Endorsement. (See S.N. Mem. at 27-34). Green Mountain argues that Sanchez should not be considered a statutory employee for any purpose. (G.M. Mem. at 29-38). However, neither party urges the Court to find that Sanchez is a statutory employee for purposes of Symbol 8 coverage.

agreement, Pro Transport must have actually exercised exclusive use and control over the Sanchez vehicle in order for Symbol 8 coverage to apply. (Id. at 19-27).

    a)  Whether Sanchez Was Hauling for Pro Transport at Time of Accident

Green Mountain's first argument is that there was insufficient evidence to prove that Sanchez was actually engaged in a job for Pro Transport at the time of the accident.[39] (G.M. Mem. at 16-18). In support of this argument, Green Mountain contends that there were no documents – no bills of lading or proof of payment – produced at trial demonstrating that at the time of the Luizzi-Sanchez accident, Sanchez was engaged in a haul for Pro Transport. (G.M. Mem. at 17). Furthermore, Green Mountain asserts that Pagan had no recollection of hiring Sanchez to perform a haul on September 22, 2001. (Id. (citing Tr. at 91-92)). Although Sanchez testified that he was hauling for Pro Transport at the time, Green Mountain urges the Court to reject Sanchez's testimony as lacking credibility. (Id.)

The Court disagrees. Having observed the demeanor of the witnesses during the trial, the Court credits Sanchez's testimony that, at the time of the accident, he was hauling a load of recycled paper for Pro Transport. (Tr. at 141-42, 185). Sanchez testified that Pagan had called him the day before to arrange the haul, providing him with the pick-up and drop-off locations. (Id.) Although Green Mountain is correct that Pagan no longer had any records of a Sanchez haul on the date of the accident due to the vandalism of the Pro Transport office (id. at 94, 100), and that Pagan had no specific recollection of hiring Sanchez on that day, Pagan admitted that he "might have" hired Sanchez on September 22, 2001. (Id. at 91). Moreover, Pagan did recall

---

[39]State National describes Green Mountain's assertion that Sanchez was not hauling for Pro Transport at the time of the accident as a "smoke screen." (See S.N. Reply at 8).

giving Sanchez work for Rapid Recycling, even if he did not recall the exact dates. (Id. at 91-92).

Green Mountain argues that Sanchez's testimony should not be believed because he testified at one point that he was working exclusively for Pro Transport during the time the Lease Agreement was in effect (id. at 138-39, 155, 170), and yet later, when pressed, Sanchez testified that he could not recall if he hauled for other companies during the period of the Lease Agreement. (Id. at 181). As additional evidence that Sanchez was not hauling exclusively for Pro Transport during the year the Lease Agreement was in effect, Green Mountain also points out the improbability of Sanchez's testimony relating to the expenses required to maintain his vehicle in light of the income that he earned from Pro Transport during this period. (G.M. Mem. at 17-18).

While the Court recognizes that Sanchez's recollection as to whether he hauled for anyone other than Pro Transport during the period of the Lease Agreement was not entirely clear, his testimony regarding the date of the accident was unequivocal and not challenged by any other evidence. Having observed him on the witness stand, the Court credits Sanchez's testimony in this regard and finds that he was hauling for Pro Transport on the day of the Luizzi accident.

     b)  <u>Whether Sanchez and Pro Transport Had a Valid Lease Agreement</u>

Turning next to Green Mountain's argument that there was no valid lease agreement, State National disagrees, arguing that "the only reliable evidence presented at trial was that Mr. Sanchez was operating his tractor . . . pursuant to the [L]ease [A]greement between Mr. Sanchez and Pro Transport." (S.N. Mem. at 20). State National cites the fact that the Lease Agreement was in writing, identifies the vehicle being leased, contained a specific time period during which

34

Sanchez would haul for Pro Transport, and states that Sanchez is to work "exclusively for Pro Transport." (Id. at 27).

Despite this evidence of a written Lease Agreement that on its face was in effect at the time of the accident, Green Mountain argues that the Lease Agreement was unenforceable because: (1) there was no meeting of the minds and no consideration offered for the bargain; and (2) the Agreement failed to comply with FMCSA regulations. (G.M. Mem. at 19-21).

       i)  New Jersey Contract Law

Pursuant to New Jersey law, a legally enforceable contract must have: (1) a meeting of the minds (i.e. "the parties reached an agreement to do what is alleged"); (2) offer and acceptance; (3) consideration (i.e. "each party gave or promised something of value to the other"); and (4) certainty (i.e. that "the terms of the agreement were reasonably certain"). Big M, Inc. v. Dryden Advisory Grp., No. 08 CV 3567, 2009 WL 1905106, at *13 (D.N.J. June 30, 2009) (citations omitted). Even though New Jersey law takes an expansive view of the role of extrinsic evidence in the interpretation of contracts, see, e.g., Conway v. 287 Corporate Ctr. Assocs., 187 N.J. 259, 269, 901 A.2d 341, 346-47 (2006) (explaining that the court "consider[s] all the relevant evidence that will assist in determining the intent and meaning of the contract"), the court will not consider extrinsic evidence when "the meaning of the term is obvious." See, e.g., Ya Global Invs., L.P. v. Cliff, 419 N.J. Super. at 13, 15 A.3d at 864 (upholding the trial court's refusal to hear extrinsic evidence in order to interpret the term "parties," because the contract language was not "susceptible to more than one reasonable interpretation," and because the interpretation requested by plaintiff was "not one 'which the written words will bear'") (quoting Garden State Plaza Corp. v. S.S. Kresge Co., 78 N.J. Super. 485, 498, 189 A.2d 448,

455 (N.J. Super. Ct. App. Div. 1963)).

Thus, in interpreting contract language, New Jersey courts have held that extrinsic evidence may not be considered "to vary or contradict the acknowledged terms of an integrated contract." Ya Global Invs., L.P. v. Cliff, 419 N.J. Super. 1, 12, 15 A.3d 857, 863 (N.J. Super. Ct. App. Div. 2011); see also Nemco Const. Corp. v. AARK Const. Grp., No. 98 L 3857, 2009 WL 1491404, at *4 (N.J. Super. Ct. App. Div. May 29, 2009) (upholding the lower court's refusal to admit extrinsic evidence to aid interpretation of a settlement agreement – which is governed by contract law – where there was no ambiguity with respect to the definition of the term at issue). Indeed, "'[s]o far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant.'" Ya Global Invs., L.P. v. Cliff, 419 N.J. Super. at 13, 15 A.3d at 863 (quoting Atlantic N. Airlines v. Schwimmer, 12 N.J. 293, 302, 96 A.2d 652, 656 (1953)).

In arguing that Pro Transport and Sanchez did not have a meeting of the minds about the terms of the Agreement, Green Mountain compares Pagan's testimony with that of Sanchez. Pagan testified that he "had no expectation that owner-operators who signed such arrangements would work for him exclusively." (See G.M. Mem. at 20-21 (citing Tr. at 164)). By contrast, Green Mountain points to Sanchez's testimony that at least at one point he believed himself to be working solely for Pro Transport pursuant to the Lease Agreement.[40] (Id.)

Green Mountain also argues that the Lease Agreement lacked consideration because Pro Transport "neither obtained nor gave anything by entering into" the Agreement. (Id. at 20-21).

---

[40]Green Mountain claims that Sanchez's testimony was unclear and inconsistent with respect to his view of the meaning of the Lease Agreement. (See G.M. Mem. at 21). The Court disagrees and credits Sanchez's testimony in this regard.

According to Green Mountain, Pagan entered into the type of lease agreement at issue in this case with any driver who wanted one and that, "from Pagan's perspective, if an owner-operator had such an arrangement[,] it had no bearing on the owner-operator's relationship with Pro Transport, [and] that they were treated no differently than owner-operators who did not have such written arrangements." (Id. (citing Tr. at 80-81)). Green Mountain claims that Sanchez could assert only a series of "possibilities" regarding the benefit Sanchez received from entering into the Agreement.

Contrary to Green Mountain's contentions, the Court finds that the Lease Agreement reached between Sanchez and Pro Transport was a valid contract under New Jersey law. Despite Green Mountain's assertions, the Agreement's language is unequivocal and unambiguous: "We [Pro Transport] provide a permanent Lease Agreement for one year provided that he [Sanchez] is under our Exclusive use and control." (S.N. Ex. 44). The Agreement further provided liability insurance for Sanchez while he was hooked to a container (id.), and Pagan testified that owner-operators wanted lease agreements to obtain the benefit of the less expensive bobtail insurance. (Tr. at 79). Thus, from the language of the Agreement, it is clear that the consideration offered to Sanchez was the provision of liability insurance and the consideration offered to Pro Transport was the exclusive one-year lease.

The fact that long after the term of the Agreement had expired, Pagan testified that he had no expectation that Sanchez would haul exclusively for him and that he had no intention of enforcing the exclusivity provision does not alter the enforceability of the Agreement or invalidate the contract between the parties. Had Pagan chosen to enforce the exclusivity provision at the time the Agreement was still in effect, Sanchez's alleged failure to drive

37

exclusively for Pagan may have been grounds to revoke the Agreement. In this case, however, the Court will not consider testimony that seeks to undermine the plain terms of the Agreement long after the fact. Ya Global Invs., L.P. v. Cliff, 419 N.J. Super. at 14, 15 A.3d at 864 (quoting Conway v. 287 Corp. Ctr. Assocs., 187 N.J. at 270, 901 A.2d at 347) (explaining that where, as here, the language of a contract is clear, the Court may not consider the testimony of the parties to the extent that they are attempting to alter the contract terms post hoc or attempt to persuade the Court to "'twist and distort' the obvious meanings of the contractual terms").

As an additional argument, Green Mountain contends that the Lease Agreement is ineffective because the Agreement was allegedly subject to an unmet express contingency. (G.M. Mem. at 19). Specifically, Green Mountain cites to the language in the Agreement that states: "We provide a permanent Lease Agreement for one year provided that he is under our Exclusive use and control." (Id. (emphasis added by Green Mountain); S.N. Ex. 44). Green Mountain argues that because Pro Transport was never given "exclusive use and control" of Sanchez's vehicle, the express contingency in the Agreement was not fulfilled and the Agreement was not effective.

Notwithstanding Green Mountain's argument, there is no evidence to demonstrate that either party believed that this language in the Agreement was a contingency that if not met would render the Agreement unenforceable. Pro Transport never sought to challenge the contractual arrangement while the Agreement was in effect based on an alleged failure to comply with the exclusivity requirement. Indeed, neither party to the Agreement ever indicated that the Agreement was unenforceable or invalid. As such, the Court finds that the alleged "contingency" does not serve to invalidate what is otherwise an enforceable Agreement.

38

ii) Failure to Comply with the FMCSA Regulations

Green Mountain also argues that the Agreement is unenforceable because it does not comply with FMCSA regulations. (See G.M. Mem. at 22; G.M. Trial Mem. at 13-14). Specifically, Green Mountain cites to Section 376.11 of the FMCSA regulations, which dictates that, with certain exceptions, an "authorized carrier may perform authorized transportation in equipment it does not own only under" certain, specified conditions. 49 C.F.R. § 376.11. One such condition is that there must be a "written lease granting the use of the equipment and meeting the requirements contained in Section 376.12." Id. Section 376.12 contains a number of other requirements as well, including the start and end dates for the lease (see 49 C.F.R. § 376.12(b)), a provision that the motor carrier has "exclusive possession, control, and use of the equipment for the duration of the lease," a provision that requires the motor carrier to assume "complete responsibility for the operation of the equipment for the duration of the lease" (see 49 C.F.R. § 376.12(c)), and a provision that makes clear which party is responsible for the cost of fuel, taxes, permits, tolls, and the like. (See 49 C.F.R. § 376.12(e)).

As Green Mountain suggests, a review of the Lease Agreement demonstrates that it is missing numerous provisions required by Section 367.12. For example, the Agreement does not specify the amount to be paid for the tractor or the driver's services.[41] Additionally, there is no term specifying whose responsibility it would be to pay expenses, such as the cost of fuel, permits, tolls, ferries, or taxes, nor is there any mention of who is to be responsible for removing identifying marks from the vehicle. Moreover, while the Agreement states that "he is under our Exclusive use and control," referring to Sanchez, the Agreement does not specify, as is required,

---

[41]Pagan testified that Sanchez was paid by the haul. (See Tr. at 88).

that the "authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease." 49 C.F.R. § 367.12(c) (emphasis added).

Relying on a case from the Southern District of Alabama, Green Mountain argues that "[c]overage is not available under hired car coverage where the lease violates FMCSA requirements." (G.M. Trial Mem. at 13) (citing Canal Ins. Co. v. United States Fire Ins. Co., No. 04 CV 94, 2006 U.S. Dist. LEXIS 34233, at *30-31 (S.D. Ala. May 26, 2006) (citing Liberty Mut. Fire Ins. Co. v. Canal Ins. Co., 177 F.3d 326 (5th Cir. 1999))). Indeed, according to Green Mountain, a violation of "any one of the FMCSA requirements invalidates the lease." Id. (citing Carroll v. Kamps, 795 F. Supp. 2d 794 (N.D. Ind. 2011); Port Drivers Fed'n 18, Inc. v. All Saints Express, Inc., 757 F. Supp. 2d 443, 453 (D.N.J. 2010); Canal Ins. Co. v. United States Fire Ins. Co., 2006 U.S. Dist. LEXIS 34233 (S.D. Ala. 2006)).[42]

In response, State National contends that courts "are unwilling to allow carriers to hide behind defective or ineffective leases as a reason for there to be no insurance coverage for an innocent, injured member of the general public." (S.N. Reply at 14) (citing to Zamalloa v. Hart, 31 F.3d 911, 917-18 (9th Cir. 1994)). As State National explains, in Zamalloa v. Hart, the court reasoned that because policy considerations caution against a motor carrier benefitting from its own failure to comply with the regulatory scheme, a motor carrier that fails to enter into a proper written lease – as is required by the statutory scheme – may not be relieved from liability for that reason. 31 F.3d at 917-18 (holding that an oral lease had been created by the parties, "and if the facts show that the lease had taken effect at the time of [the driver's] accident, then [the motor carrier] may be held liable for the accident as [the driver's] statutory employer"). Put simply, the

---

[42]As discussed infra at pp. 41-43, these cases do not actually support this proposition.

40

court reasoned that "[i]t would defeat the intent behind [the regulatory scheme] to enable carriers to benefit from their own failure to comply with the ICC regulations." Id. at 918.

The cases cited by Green Mountain in support of its position that compliance with FMCSA regulations is required are not persuasive because each case is distinguishable from the current situation.  In each case, the courts were asked to determine, as between two corporate entities, which entity's insurance coverage applied; they were not entertaining a situation where an injured third party was seeking to recover from an accident with a motor carrier using an uninsured independent owner-operator.  Since, in this case, Sanchez was not employed by a corporate entity and because he believed that he was covered by the Policy (see Tr. at 144), cases that discuss two insured corporate entities disputing which insurance policy provides coverage are inapposite.

For example, in Canal Insurance Co. v. United States Fire Insurance Co., the dispute as to coverage was between the motor carrier company and the company that owned the trailer.  2006 U.S. Dist. LEXIS 34233, at *2-3.  In finding that the agreement between the parties was not a valid lease because it did not comply with the requirements set forth in the C.F.R., the court was not asked to analyze the question of coverage with respect to an injured third party.  Instead, the court's discussion was limited to an analysis of the parties' relationship to each other under the various insurance policies that arguably covered the accident.  Since the injured third party had been compensated through a settlement, the public policy concerns underlying the FMCSA were not in play.

Another case cited by Green Mountain, Port Drivers Federation 18, Inc. v. All Saints Express, Inc., 757 F. Supp. 2d 443 (D.N.J. 2010), is equally unpersuasive insofar as Green

41

Mountain cites it for the proposition that a failure to comply with the FMCSA regulations renders the Lease Agreement in this case unenforceable.  In Port Drivers, contracting independent owner-operators who leased their vehicles and driving services to defendant sought declaratory and injunctive relief, alleging that their leases with defendant did not comply with the FMCSA.  Id. at 446.  The case did not involve a claim for coverage brought by an injured third party.  Although the court ultimately found that the leases failed to comply with the FMCSA, id. at 453, the court nonetheless held that the leases were "still in force" with respect to the declaratory judgment sought by plaintiffs, actually affirming that failure to comply with FMCSA regulations does not necessarily render a lease agreement unenforceable.[43]  (Id.)

The third case cited by Green Mountain, Carroll v. Kamps, is also distinguishable in that the defendant in that case was not itself a motor carrier, but rather, was the entity for which the motor carrier was performing the haul.  795 F. Supp. 2d at 799.  To analogize, it would be as if the parties sought to hold Rapid Recycling liable for the Luizzi-Sanchez accident in this case.  Given that the public policies governing motor carriers are a driving force behind the analysis in the instant case, the Carroll v. Kamps decision is not particularly insightful with respect to the impact of the FMCSA regulations on the Agreement between Sanchez and Pro Transport.[44]

Put simply, the cases cited by Green Mountain do not implicate the FMCSA's public policy goal to ensure that innocent third parties receive protection when injured by under-insured

---

[43]In scrutinizing the lease agreements, the court in Port Drivers took into account the public policy concerns designed to "prevent[] large carriers from taking advantage of owner-operators due to uneven bargaining power."  Port Drivers Federation 18, Inc. v. All Saints Exp., Inc., 757 F. Supp. 2d at 451.

[44]Even if the cases were not distinguishable on their facts, Canal Insurance Co. v. United States Fire Insurance Co. and Carroll v. Kamps are not New Jersey cases, nor do they interpret New Jersey law; thus, they are not controlling here.

42

owner-operators and the motor carriers for which they work. Indeed, courts tend to treat disputes that involve injured third parties differently from disputes between corporate entities with competing insurance policies where this public policy concern is not at issue, holding that in the latter circumstance, "ICC considerations are not determinative." Carolina Cas. Ins. Co. v. Insurance Co. of N. America, 595 F.2d at 138 (explaining that "[w]hile a lessee cannot free itself of its federally imposed duties when protection of the public is at stake, the federal requirements are not so radically intrusive so as to absolve lessors or their insurers of otherwise existing obligations" when the issue is about "allocating financial risk among private parties") (citing Allstate Ins. Co. v. Liberty Mut. Ins. Co., 368 F.2d 121, 125 (3d Cir. 1976)).

Moreover, at least one New Jersey decision suggests that a lease that is missing some of the requirements set forth in Section 367.12 will not be invalidated as a result when the underlying issue is whether an injured third party will be reimbursed for the injuries. See Cox v. Bond Transport. Inc., 53 N.J. 186, 249 A.2d 579. In Cox v. Bond, an owner-operator who performed hauling for the defendant, a franchised interstate carrier, was involved in an accident while driving home. Id. at 191, 195, 249 A.2d at 584-85. Although the parties had entered into an oral lease agreement, there was no written lease agreement between the parties. Id. at 192, 249 A.2d at 582. The owner-operator defendant testified that he had been told "that if he 'worked out' he would be kept busy during the season" and that during that busy period, "he could not haul for anyone else without the company's consent." Id. Even though there was no written lease agreement and the accident occurred while the driver was on his way home, the New Jersey Court of Appeals upheld the jury's determination that the carrier lessee was liable under the oral lease. Id. at 204-07, 249 A.2d at 588-90. The court made it clear that "[a]

43

franchised interstate carrier cannot evade [FMCSA regulations] by making an oral or a written

lease with an owner-operator of equipment for a trip, for a day or for an indefinite period, which

attempts to exclude or limit their application." Id. at 201, 249 A.2d at 586-87.

Similarly, courts in other jurisdictions have explicitly rejected the argument that strict

compliance with the regulations is required in order to find that a valid leasing agreement exists

between a carrier and an independent owner-operator. In Planet Insurance v. Transport

Indemnity, the Ninth Circuit considered whether liability could be imposed upon a carrier absent

substantial compliance with the requirements of the ICC regulations. 823 F.2d 285, 286-87 (9th

Cir. 1987). In Planet Insurance, the truck driver had signed a written lease, but had not picked up

his load or begun displaying the carrier's placard at the time of the accident. Id. at 287.

Although the carrier argued that compliance with the regulatory requirements was a condition

precedent to establishing statutory employment and liability under the ICC, the Ninth Circuit

disagreed, holding that the contract language itself indicated "that the lease was in effect" at the

time of the accident. Id. The court reasoned that it "would stray impermissibly from the

allocation of responsibility contemplated by Congress and the ICC if [the court] held that the

lease did not come into effect until [the carrier's] signs were affixed to the truck or the load [was]

actually picked up." Id.

Here, although the Lease Agreement between Pro Transport and Sanchez does not

contain all of the provisions set forth in Section 376.11, the critical provisions are present.

Specifically, the Agreement provides for a one-year term in which Sanchez "is under our [Pro

Transport's] Exclusive use and control." (S.N. Ex. 44). The Agreement further states that Pro

Transport will "provide Liability Insurance while he is hooked to a container, and he is

44

responsible for his own when in Bobtail Condition." (Id.) The fact that the Agreement does not contain all of the provisions set forth in the applicable regulations does not alter the basic agreement reached between Pro Transport and Sanchez.

Moreover, it would contravene the federal policy designed to protect the public if Pro Transport were able to abdicate its responsibilities by entering into contracts with truckers that fail to include each of the items specified in the FMCSA regulations. See Zamalloa v. Hart, 31 F.3d at 917-18 (holding that even in the absence of a written lease, liability may be imposed upon the carrier where an oral agreement existed because "[i]t would defeat the intent behind [the federal regulations] to enable carriers to benefit from their own failure to comply with ICC regulations"); Casey v. Selected Risks Ins. Co., 176 N.J. Super. at 30-35, 422 A.2d at 87-88 (recognizing the importance of allowing innocent third parties to recover under insurance policies even where an insured breached a provision of the policy such that recovery may ordinarily be barred); Wilson v. Riley Whittle, Inc., 145 Ariz. 317, 701 P.2d 575 (Ariz. Ct. App. 1984) (reasoning that the motor carrier should be held liable because the absence of a lease was due to the motor carrier's "own loose internal procedures," and because public policy would be circumvented if the motor carrier could evade liability by arguing that a written lease agreement was required to be held liable). Indeed, such an approach would likely create perverse incentives for motor carriers to purposefully draft contracts that do not comply with the FMCSA, so that they could evade responsibility. Accordingly, the Court finds that the Lease Agreement is valid and enforceable in this case.

iii) Dominion and Control Over the Vehicle

Green Mountain argues that in order for the Sanchez vehicle to be deemed a "covered

auto" under Symbol 8, State National must prove not only that a valid lease agreement existed,

but also, that Pro Transport exercised dominion and control over the Sanchez vehicle. (G.M.

Mem. at 17-18) (citing cases). Green Mountain correctly notes that a number of cases have

found that a motor carrier must exercise sufficient dominion and control over a vehicle in order

for the vehicle to be deemed a "hired auto." (Id.) See, e.g., National Interstate Ins. Co. v.

Champion Truck Lines, Inc., No. 11 CV 5097, 2013 WL 1192395, at *3 (D.N.J. March 21, 2013)

(explaining that the "key inquiry" in determining whether a "'hired auto'" policy provision

applies is "whether the insured exercised dominion, control[,] or the right to direct the use of the

vehicle"); see also Toops v. Gulf Coast Marine Inc., 72 F.3d 483, 487 (5th Cir. 1996) (finding

that in order for a vehicle to constitute a "hired auto," "there must be a separate contract by

which the vehicle is hired or leased to the named insured for his exclusive use or control . . ." and

the vehicle "must be under the named insured's exclusive use or control") (citing Sprow v.

Hartford Ins. Co., 594 F.2d 418, 422 (5th Cir. 1979)); Loper v. National Union Fire Ins. Co., No.

99 CV 1350, 2002 WL 88942, at *2-3 (E.D. La. Jan. 22, 2002) (applying Texas law and citing

Topps v. Gulf Coast Marine, 72 F.3d at 487-88; Sprow v. Hartford Ins. Co., 594 F.2d 418; and

Griffin v. Travelers Indem. Co. of Rhode Island, 4 S.W.3d 915, 918 (Tex. App. 1999)).

 However, the District Court in New Jersey recently confirmed that under New Jersey law,

courts construe policy provisions, such as the hired auto provision of Symbol 8, differently when

considering disputes between two insurance carriers, and when considering claims by a member

of the public seeking coverage. See National Interstate Ins. Co. v. Champion Truck Lines, Inc.,

2013 WL 1192395, at *3-4. In National Interstate, Northstar contracted with Champion

Services, Inc., an interstate motor carrier, to provide hauling services for Northstar. Id. at *4-5.

Champion was responsible for selecting which truck and driver would perform the haul; Champion paid the driver and serviced the vehicle with its own mechanics; Champion paid the driver's salary; and Champion decided where the truck was operated pursuant to the Champion dispatcher's instructions. Id. at *4. In finding no "hired auto" coverage under Northstar's policy for the truck accident that gave rise to the litigation, the court reasoned that the driver did not work for Northstar: "[N]o reasonable jury could find that Northstar controlled [the driver and his tractor] because Northstar did not provide or maintain his equipment, did not choose him to perform the job, did not pay him, and did not instruct him on the particulars of performing his job." Id. The court then stated: "Because a reasonable jury could not find that Northstar controlled [the driver] and his tractor, Northstar did not hire [the driver]." (Id.) (citation omitted).

However, the court drew a distinction between cases where the issue is about "protecting the public from under- or -un-insured truckers" and those cases where the issue is about "which insurance policy is primary when both are valid and collectible." (Id. at *5). The court explained: "Federal regulations are intended 'to protect the public from the tortious conduct of judgment-proof operators of interstate motor carrier vehicles,' by requiring 'a motor carrier to assume full direction and control of leased vehicles.'" Id. at *4 (discussing the impetus for the federal regulatory regime and citing Price v. Westmoreland, 727 F.2d 494, 496 (5th Cir. 1984)); see also Agricultural Ins. Co. v. Scott, 2001 WL 253880, at *3 (explaining that pursuant to New Jersey law, courts are, among other things, to interpret insurance contracts broadly with respect to coverage provisions and narrowly with respect to exclusionary provisions) (quoting Search EDP, Inc. v. American Home Assurance Co., 267 N.J. Super. at 542, 632 A.2d at 289).

Moreover, at least two of the cases cited by Green Mountain rely on the decision in
Sprow v. Hartford Insurance Company as support for the proposition that in order for a vehicle to
be deemed a "hired auto," there must be "exclusive use or control" by the insured, in addition to
the requirement that there be "a separate contract by which the vehicle is hired or leased to the
named insured for his exclusive use or control." Toops v. Gulf Coast Marine, 72 F.3d at 487; see
also Loper v. National Union Fire Ins. Co., 2002 WL 88942, at *2.  However, a close reading of
the Sprow decision makes it clear that the court's holding that the vehicle in question was not a
"hired auto" was based solely on the absence of a separate lease agreement between the parties.
594 F.2d at 422-23.  The court stated:

> Decisions by our courts have established that for a vehicle to
> constitute a hired automobile, there must be a separate contract by
> which the vehicle is hired or leased to the named insured for his
> exclusive use or control.

Id. at 422.  The court's characterization of the contract suggests that the "exclusive use or
control" issue was actually just a byproduct of the lease agreement; by virtue of the lease
agreement, the named insured obtains exclusive use or control.  The case contains no further
discussion of whether proof of the exercise of actual control is needed when there is a separate
lease agreement that confers the right of dominion and control on the leaseholder.  Accordingly,
the two-pronged test cited in Toops v. Gulf Coast Marine and Loper v. National Union Fire Ins.
Co. appears to be based on a misreading of Sprow.

Additionally, the cases relied upon by Green Mountain deal with scenarios implicating
different policy concerns.  For example, many of the cases deal with coverage disputes between
the competing insurance policies of two corporate entities where the question of which entity
"controls" the vehicle is ultimately decisive.  See, e.g., Johnson v. Royal Indemnity Co., 206 F.2d

48

561 (5th Cir. 1953) (finding no hired auto coverage where W.R. Core had an understanding with various trucking entities to haul gravel, one of which was Pete James, which hired and paid the drivers and exercised control over the vehicles); Selective Way Ins. Co. v. Travelers Prop. Cas. Co. of Am., 724 F. Supp. 2d 520 (E.D. Pa. 2010) (finding no hired auto coverage under States' policy where States orally contracted with Stafursky Paving to provide hauling services and Stafursky selected the truck and driver and paid the driver, who determined his own route); Earth Tech, Inc. v. U.S. Fire Ins. Co., 407 F. Supp. 2d 763 (E.D. Va. 2006) (in a coverage dispute where Capitol hired FCI to perform transportation services, finding no hired auto coverage under Capitol's policy where FCI, which owned the vehicles, selected the vehicle and driver for each haul, exercised control over the route, and paid for fuel); Occidental Fire & Cas. Co. of N. Am. v. Westport Ins. Co., No. 02 CV 8923, 2004 WL 208616, at *6-10 (E.D. Pa. Sept. 10, 2004) (in considering whether the hired auto provision in B.K. Leasing Company's policy provided coverage where B.K. arranged for F.O. Transport, Inc. to provide a tractor and driver to haul B.K.'s trailer, concluding that because F.O. determined which truck and driver would be assigned to the haul and because the driver took orders from F.O. regarding the route, fuel, and maintenance, it was clear that F.O. controlled the vehicle and therefore there was coverage under F.O.'s policy).

Other cases cited by Green Mountain involve scenarios where no exclusive written agreement existed. See, e.g., Fertick v. Continental Cas. Co., 351 F.2d 108 (6th Cir. 1965) (in a coverage dispute between insurers, where a corporation's policy covered a decedent who was driving the company's vehicle with permission, finding no hired auto coverage under the policy of the agent who was paid $40 for simply procuring the driver, relying on the absence of "a

separate contract of hiring or renting the automobile") (emphasis in original). Still other cases

involve slightly different fact patterns that make them distinguishable from the instant action.

See, e.g., American Cas. Co. of Reading, Pa. v. Denmark Foods, Inc., 224 F.2d 461 (4th Cir.

1955) (in a pre-FMCSA dispute between insurers, finding no hired auto coverage under

Denmark's policy where Denmark hired H.F. Phillips, Jr. to haul cucumbers, and Phillips used

his own truck and employed and paid his own driver, and the policy explicitly excluded from

coverage accidents that occurred while the vehicle was away from the premises of the insured);

Kelly v. Phoenix Assurance Co. of N.Y., 225 F. Supp. 562 (D. Md. 1964) (finding no hired auto

coverage in suit brought by Tomke to seek indemnity from its negligent employee for injuries

incurred by Feldman, where Feldman, who was driving his own vehicle under contract to

London, was not an "employee" of London, and where the vehicle had been driven in violation

of the terms of the policy, but not discussing control factors); Liberty Mut. Ins. Co. v. American

Employers Ins. Co., 556 S.W.2d 242, 245 (Sup. Ct. Tex. 1977) (in a coverage dispute between

two insurers, finding no liability for "borrowed" vehicle under Homette's policy where an

employee of U.S. Plywood, driving U.S. Plywood's vehicle, was injured during the unloading of

the vehicle, and stating that "merely proving one had the right to remove goods from a truck is

not evidence one was a 'borrower' of the truck").

By contrast, several cases that have considered coverage questions involving independent

owner-operators driving under an exclusive lease agreement to haul goods have found that the

existence of the lease agreement alone is sufficient to establish hired auto coverage. See

Transport Indem. Co. v. Liberty Mut. Ins. Co., 620 F.2d 1368, 1371-72 (9th Cir. 1980)

(explaining that courts resolving situations dealing with independent contractors have, in their

efforts to find the existence of coverage, required either a lease agreement or the exercise of control, but not both) (citing cases); see also Lumberman's Mut. Cas. Co. v. Morgan, 513 So.2d 1283 (Fla. App. 4 Dist. 1987) (finding the existence of an exclusive lease agreement sufficient to find hired auto coverage under the policy for an independent contractor).

Indeed, one of the cases cited by Green Mountain, Russom v. Insurance Co. of North America, actually holds that a lease agreement alone is sufficient to establish coverage: "Where there is a separate contract hiring or leasing a vehicle in addition to an agreement to haul a particular load, courts have held that the vehicle becomes a 'hired automobile.'" 421 F.2d 985 (6th Cir. 1970) (citing cases) (finding that a small time trucker's lease of two vehicles to Wesson Oil for the purpose of hauling oil was sufficient to render Wesson's insurer liable under the policy for injuries incurred, even though Wesson never exercised control over the trailer or its driver). The Sixth Circuit explicitly noted that even though Wesson never exercised control, because it had "leased the trailer, [it] had the right to control the trailer. The fact that Wesson failed to exercise that right of control is immaterial." Id. at 993; see also Gore v. State Farm Mut. Ins. Co., 649 So.2d 162 (La. App. 2d Cir. 1995) (reasoning that "when a thing is leased or hired, the lessor has complete control of the thing to use it as he sees fit"). These cases suggest that it is the right to exercise control – rather than its actual exercise – that determines when an auto may be deemed a "hired auto." Id.

Accordingly, having considered the cases cited by Green Mountain, the Court concludes that those cases that appear to require both an agreement and evidence of the exercise of control are distinguishable from the instant case. Where, as here, the question is whether any coverage is provided to an injured third party, the public policy underlying the FMCSA regulations to

51

eliminate the practice by motor carriers of hiring uninsured independent truckers to avoid liability should instruct the Court's decision.  Thus, the Court concludes that the Lease Agreement alone, which gave Pro Transport the right to exercise exclusive control, is sufficient in this case to bring the Sanchez vehicle within the "hired auto" provision of the Policy, even though Pagan and Pro Transport never chose to enforce that right.[45]

     3)  <u>Conclusion – Symbol 8</u>

The Court finds that there was a valid Lease Agreement granting exclusive use and control to Pro Transport and that, for purposes of Symbol 8 coverage, Sanchez was an independent contractor rather than an employee.  Thus, pursuant to the terms of Symbol 8, the Court hereby finds that the Sanchez vehicle qualifies as a "covered auto" pursuant to Symbol 8 of the Policy.

  D.  <u>Symbol 9 Coverage</u>

Although the Court's finding of Symbol 8 coverage obviates the need to analyze whether coverage for the Sanchez vehicle is available under Symbol 9, given the lack of binding precedent governing the Court's analysis of the "covered auto" Policy provisions at issue in this case, the Court will undertake a separate analysis of whether Symbol 9 provides an alternative source of coverage.

Symbol 9, which covers "Non-Owned Autos," provides coverage for:

---

[45]State National cites the fact that the Sanchez vehicle bore the Pro Transport logo and motor carrier number as conclusive evidence of control by Pro Transport.  (S.N. Mem. at 20-22).  However, as the court in <u>National Interstate Ins. Co. v. Champion Truck Lines, Inc.</u>, 2013 WL 1192395, at *4, noted:  "In 1986, . . . the ICC amended the leasing regulations to clarify that it never intended to assign liability based on the existence of placards or to interfere with otherwise applicable State law" (internal quotation marks and citation omitted).  Thus, while the existence of the logo and motor carrier number provide corroborating evidence that Sanchez drove on behalf of Pro Transport, they alone are insufficient to prove control.

> Only those 'autos' you do not own, lease, hire, rent[,] or borrow
> that are used in connection with your business. This includes
> 'autos' owned by your 'employees,' partners (if you are a
> partnership), [and] members of their households but only while
> used in your business or your personal affairs.

(S.N. Ex. 10). Pursuant to the plain language of Symbol 9, if the Sanchez vehicle was not

owned, leased, hired, rented, or borrowed by Pro Transport, but was being "used in connection

with" Pro Transport's business at the time of the accident, then the Sanchez vehicle qualifies as a

"covered auto" under Symbol 9.

     1) "In Connection With" Requirement

Turning first to the question of whether the Sanchez vehicle was being used in connection

with Pro Transport's business, State National argues that "there is no credible dispute" as to this

issue, and that "[a]ll of the factors that have influenced the New Jersey courts to conclude that a

tractor is being operated in the course and scope of a motor carrier's business are found in this

action . . . ." (S.N. Mem. at 22-23 (citing Planet Ins. Co. v. Anglo American Ins. Co., 312 N.J.

Super. 233, 711 A.2d 899)). State National also contends that 49 C.F.R. § 376.12 establishes a

rebuttable presumption that the Sanchez vehicle was being operated in connection with Pro

Transport's business. (S.N. Mem. at 23 (citing Bays v. Summit Trucking, LLC, 691 F. Supp. 2d

725 (W.D. Ky. 2010))).

In response, Green Mountain argues that the phrase "in connection with" has the same

meaning as the phrase "scope of employment;" thus, employees may operate a vehicle "in

connection with" their employer's business, but independent contractors may not. (G.M. Mem.

at 31-32) (citing cases). However, the cases cited by Green Mountain are factually

distinguishable from this matter and they do not govern the analysis here. See, e.g., Union

53

Standard Ins. Co. v. Hobbs Rental Corp., 566 F.3d 950, 954 (10th Cir. 2009) (holding held that the non-owned auto provision did not extend to cover independent contractors, but not addressing the implications of the FMCSA where the haul and the accident both occurred intrastate); Huddleston v. Luther, 897 So.2d 887, 888 (La. Ct. App. 2005) (analyzing the non-owned auto provision, but solely under state contract law); Adams v. Thomason, 753 So.2d 416, 418 (La. Ct. App. 2000) (finding no non-owned auto coverage for gin mill owner who lent its trailer to a cotton producer, where the vehicle was being used "in connection with" the cotton producer's business, not the gin mill's business, but not discussing FMCSA regulations); Bamber v. Lumbermens Mut. Cas. Co., 451 Pa. Super. 548 (Pa. Super. Ct. 2011) (making no mention of whether an independent contractor's vehicle may receive coverage under a non-hired auto coverage where the employee sought under-insured motorist benefits under the employee's own policy).

After carefully considering the parties' arguments, the Court finds that the cases cited by Green Mountain for the proposition that Sanchez was not operating his vehicle "in connection with" Pro Transport's business are largely distinguishable from this case. Accordingly, the Court concludes that the Sanchez vehicle was being operated "in connection with" Pro Transport's business at the time of the accident for purposes of Symbol 9 coverage. (See discussion infra at pp. 32-34).

   2)  Sanchez as a Pro Transport Employee

      a)  The Parties' Arguments

State National raises a series of arguments in support of its contention that Sanchez was a Pro Transport employee for purposes of Symbol 9 coverage. (See S.N. Mem. at 23-24, 30-34;

S.N. Reply at 11-13).  Citing to <u>Harris v. Mitchell,</u> 358 N.J. Super. 504, 818 A.2d 443 (N.J.

Super. Ct. App. Div. 2003) and <u>Consumers County Mutual Insurance Co. v. P.W. & Sons</u>

<u>Trucking, Inc.,</u> 307 F.3d 362 (5th Cir. 2002), State National suggests that the underlying public

policy of the FMCSA – namely, protecting innocent third parties injured in accidents – requires a

finding that Sanchez qualifies as a "statutory employee" for purposes of Symbol 9.  (S.N. Mem.

at 30; S.N. Reply at 11-12).  State National explains that "'employee' status is essentially a

legislative fiction intending to shift responsibility for the safe use of leased equipment to the

interstate carrier for the purpose of protecting the public, without consideration of whether in fact

that carrier controls the conduct of the contractor and its employees."  (S.N. Mem. at 30).  State

National also argues that 49 U.S.C. § 31132(2), defining "employee" as "an operator of a

commercial motor vehicle (<u>including an independent contractor</u> when operating a commercial

motor vehicle) . . . ." provides a source of statutory employment for Sanchez.  (<u>Id.</u> at 31-32)

(emphasis added) (citing to <u>Canal Ins. Co. v. ML&S Trucking, Inc.,</u> No. 10 CV 2041, 2011 WL

2666824 (W.D. Ark. July 6, 2011)).[46]

        In response, Green Mountain argues that because Pro Transport did not exercise sufficient

control over Sanchez and because both Pagan and Sanchez understood Sanchez to be an

independent contractor, Sanchez was not an employee of Pro Transport for Symbol 9 purposes.

(G.M. Mem. at 33-34).  Additionally, Green Mountain contends that the definition of "employee"

---

        [46]As a separate argument, State National cites to <u>Santander v. Wills Trucking Company,</u>
No. 99 CP 785, 2000 WL 34429991 (N.J. Adm. Nov. 20, 2000), a workers' compensation case,
for the proposition that even if Sanchez were not a "statutory employee," he may be considered
an employee under either the "right to control" or under "relative nature of the work" common
law tests.  (<u>Id.</u>)  The Court does not address this argument, however, because the Court finds that
Sanchez, as an independent contractor, is considered a statutory employee for purposes of
Symbol 9 coverage and therefore, such analysis is unnecessary at this time.

set forth in the FMCSA, which includes independent operators as employees, should not be relied upon in interpreting the Policy provision here.

      b)  <u>Analysis</u>

The FMCSA defines "employee" as:

> [A]n operator of a commercial motor vehicle (<u>including an independent contractor</u> when operating a commercial motor vehicle), a mechanic, a freight handler, or an individual not an employer who –
> > (A) directly affects commercial motor vehicle safety in the course of employment; . . . .

49 U.S.C. § 31132(2) (emphasis added).  Under this definition of employee, Sanchez, as an "independent contractor," seems to fit squarely within the statutory definition of employee.  <u>See Ooida Risk Retention Grp. v. Williams</u>, 579 F.3d 469, 474-75 (5th Cir. 2009) (finding sole proprietor qualified as an "employee" of the entity for which he was hauling, pursuant to the FMCSA); <u>cf.</u>, <u>Carolina Cas. Ins. Co. v. Arkansas Transit Homes, Inc.</u>, No. 10 CV 1614, 2011 WL 7719671, at *5-6 (N.D. Ala. Dec. 22, 2011) (reasoning that because the owner of the company that leased the truck, escort vehicle, and drivers was an "employer" as defined in the FMCSA,[47] he did not qualify as an "employee" under the statutory definition, even though at times he served as an escort driver).  Indeed, given that the definition provided by the FMCSA includes a series of specific job categories that would not ordinarily be considered "employees," it appears that the FMCSA does not intend for the term "employee" to have its ordinary meaning.

      To bolster its argument that independent contractors such as Sanchez should be considered "employees" for purposes of Symbol 9, State National refers to the definitions section

---

[47]The statute defines "employer" as a "person engaged in a business affecting interstate commerce that owns or leases a commercial motor vehicle in connection with that business, or assigns an employee to operate it. . . ."  49 U.S.C. § 31132(3)(A), (B).

of the FMCSA Regulations, 49 C.F.R. § 390.5, which defines an "employee" as "any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety." (S.N. Reply at 11-12 (citing 49 C.F.R. § 390.5)); see also Consumers Cnty. Mut. Ins. Co. v. P.W. & Sons Trucking, Inc., 307 F.3d 362 (5th Cir. 2002). Under this definition, the term employee "includes a driver or a commercial motor vehicle (including an independent contractor while in the course of operating a commercial motor vehicle) . . . ." Id. (emphasis added).

In Consumers County Mutual Insurance Co. v. P.W. & Sons Trucking, Inc., the court was asked to construe a commercial auto insurance policy in order to determine whether the injured driver of a vehicle hired to work on a load-by-load basis was an employee and therefore excluded from coverage under the policy. 307 F.3d 362. The court noted that the traditional state law distinction between employees and independent contractors was eliminated by 49 C.F.R. § 390.5, explaining that where the policy is a public liability policy designed specifically for use by a motor carrier involved in the interstate trucking industry, federal law requires motor carriers to procure at least the minimum of public liability insurance to obtain an operating permit. Id. at 366 (citing Motor Carrier Safety Act of 1984, 49 U.S.C. § 13906 (2000); 49 C.F.R. §§ 387.1 et seq). "The purpose of this insurance requirement is to ensure that a financially responsible party will be available to compensate members of the public injured in a collision with a commercial motor vehicle." Id. The elimination of the common law distinction between independent contractors and employees "serves to discourage motor carriers from using the independent contractor relationship to avoid liability exposure at the expense of the public." Id.

Similarly, in Ooida Risk Retention Group, Inc. v. Williams, the Fifth Circuit examined

57

the regulatory definitions of "employee" and "employer" as provided in 49 C.F.R. § 390.5,

finding that because the driver in question qualified as an independent contractor, he was an

"employee" pursuant to Section 390.5, for purposes of finding coverage.  579 F.3d at 474; see

also Pouliot v. Paul Arpin Van Lines, Inc., 292 F. Supp. 2d 374, 378-79 (D. Conn. 2003) (noting

that while there is, in fact, a distinction between an "employee" and an "independent contractor,"

the regulations provide that independent contractors are to be treated as "employees" "while in

the course of operating a commercial motor vehicle"); Perry v. Harco Nat'l Ins. Co., 129 F.3d

1072, 1075 (9th Cir. 1997) (citing Johnson v. S.O.S. Transport, 926 F.2d 516, 524 n.20 (6th Cir.

1991) (holding as "'irrelevant'" the distinction between a trucker as an employee or an

independent contractor "because the terms were synonymous in the regulations")).

     Green Mountain relies on the decision in Canal Insurance Company v. ML&S Trucking

Inc. to argue that the definitions of "employee" provided in 49 U.S.C. § 31132(2) and in 49

C.F.R. § 390.5 should not be used when construing the Policy provision at issue here.  (See G.M.

Mem. at 38).  Specifically, Green Mountain argues that the court in Canal Insurance declined to

classify the plaintiff as an "employee" using the definition provided by the FMCSA, and clearly

held that the plaintiff "was not an employee. . .under the ordinary definition of 'employee.'"  (Id.

(citing 2011 WL 2666824, at *4)).  According to Green Mountain, the court "made no finding

that it was of the view that this definition of employee was in any way determinative of whether

the driver was an 'employee' as that term was used in the [policy] provision at issue."  (Id.)

However, the court's refusal to employ the statutory definition in construing the policy's

employee exclusion ultimately led to a determination that the injured party who "never operated

the subject vehicle, never helped load or unload the vehicle, and performed no function to assist

the driver of the vehicle," was clearly not an "employee" who should be denied coverage under the policy exclusion. The court's narrow interpretation of "employee" in the context of a policy exclusion does not preclude the court from broadly construing the term when considering a coverage provision.[48]

To construe the explicit language of the statute and the regulation to find that the traditional definition of "employee" does not apply in the context of federal motor carrier liability where the purpose is to ensure coverage of the public is consistent with New Jersey authority. In Harris v. Mitchell, the court noted that the purpose of statutory employment is "to shift responsibility for the safe use of leased equipment to the interstate carrier for the purpose of protecting the public . . . ." 358 N.J. Super. at 510. Similarly, as discussed above, in Casey v. Selected Risks Insurance Company, the court declined to enforce the otherwise applicable state insurance law scheme in interpreting an insurance policy provision in an effort to protect injured members of the public. 176 N.J. Super. at 31-32, 422 A.2d at 87-88. Indeed, the court found that an injured party may recover under an insurance policy "even if the insured breaches the notice provision or some other provision of the policy which would ordinarily bar recovery." Id. (drawing a distinction between "controversies between insurance carriers as to such matters as which of them affords primary rather than excess coverage" and situations that involve whether innocent members of the public will receive compensation for their injuries).

Accordingly, given the definitions of "employee" found in 49 U.S.C. § 31132(2) and in 49 C.F.R. § 390.5, which explicitly include independent contractors, as well as the underlying

---

[48]But cf., Consumers County Mutual Insurance Co. v. P.W. & Sons Trucking, Inc., where the court relied on the federal definition of employee to conclude that a policy exclusion which precluded recovery by injured employees also precluded recovery by the independent contractor driver under the policy. 307 F.3d at 366-67.

public policy considerations, the Court finds that Sanchez was a statutory employee for purposes of Symbol 9 coverage.[49]

    3)  Conclusion – Symbol 9

Since the Court finds that the Sanchez vehicle was being driven "in connection with" Pro Transport's business, and since Sanchez was a statutory "employee" of Pro Transport for purposes of finding insurance coverage, the Court concludes that the Sanchez vehicle qualifies as a "covered auto" pursuant to Symbol 9 of the Policy.[50]

    E.  Truckers Endorsement Requirements

Having determined that the Sanchez vehicle was a "covered auto" under the Policy, the only remaining question is whether Sanchez[51] qualifies as an "insured" as defined in the Truckers

---

[49]The Court recognizes that importing the FMSCA's definition of "employee" into the analysis of Symbol 9 coverage under the Policy to include independent contractors may appear to be incongruous with the Court's earlier analysis of the meaning of "employee" as it applies to the exclusion set forth in Symbol 8. However, in interpreting the term "employee" differently in the context of Symbol 8 and Symbol 9, the Court has considered that New Jersey courts "narrowly construe exclusionary provisions," such as the one contained in Symbol 8, and "broadly construe coverage provisions," Agricultural Ins. Co. v. Scott, 2001 WL 253880 at *3, so as to further the "strong legislative policy of assuring at least some financial protection for innocent accident victims." Proformance Ins. Co. v. Jones, 185 N.J. at 414-15, 887 A.2d at 151-52. In this instance, construing the coverage provision of Symbol 9 to include "independent contractors" within the definition of "employee" as set forth in the various provisions of the FMCSA is consistent with not only the federal policy that is designed to insure coverage to accident victims, but is also consistent with New Jersey principles of construction as applied to insurance policies.

[50]State National raises other arguments in support of its assertion that Symbol 9 coverage is available. However, because the Court has concluded that under the statutory and regulatory definitions of "employee," Sanchez qualifies as an employee, the Court has not addressed these additional arguments.

[51]Since subsection (a) of the Truckers Endorsement provides coverage to the holder of the Policy for all "covered autos," and since the Court has determined that the Sanchez vehicle was a "covered auto" under Symbols 8 and 9, Pro Transport qualifies as an "insured" under the Truckers Endorsement.

Endorsement to the Policy.  State National contends that coverage is available to Sanchez under

subsections (b) or (d) of the Truckers Endorsement.  (S.N. Mem. at 15).

Pursuant to subsection (d)[52] of the Truckers Endorsement, an "insured" is defined as:

> [T]he owner or anyone else from whom you hire or borrow a
> covered "auto" that is not a "trailer" while the covered "auto:"
>> (1) is being used exclusively in your business as a
>> "trucker;" and
>> (2) is being used pursuant to operating rights granted to you
>> by a public authority.

(See S.N. Ex. 10).  State National argues that subsection (d) "applies to Sanchez in his capacity

as the owner of the tractor" and that all other requirements of the subsection are satisfied.  (S.N.

Mem. at 16-17, 32-34).  Since the Court has found that Pro Transport hired the Sanchez vehicle

and that the Sanchez vehicle was not a trailer, the issues to be determined are:  (1) whether the

Sanchez vehicle was being used "exclusively" in Pro Transport's business, and (2) whether the

Sanchez vehicle was being used pursuant to "operating rights" granted by a public authority.

Green Mountain argues that neither of these conditions existed.  (G.M. Mem. at 39).

   1)  Exclusivity Requirement

In order to satisfy the exclusivity requirement of subsection (d), State National must

prove that the Sanchez vehicle was being used exclusively for Pro Transport's hauling business

at the time of the accident.  See, e.g., Diamond State Ins. Co. v. Ranger Ins. Co., 47 F. Supp. 2d

579, 587 (E.D. Pa. 1999) (finding that the exclusivity requirement of the policy was fulfilled

because, among other reasons, there were no facts showing that the vehicle was being used for

any purpose other than transporting the insured's goods at the time of the accident); Maryland

---

[52]Since the Court concludes that coverage for Sanchez exists under subsection (d), the
Court has not addressed the arguments relating to subsection (b).

Cas. Co. v. City Delivery Serv., Inc., 817 F. Supp. 525, 529 (M.D. Pa. 1993) (finding that the vehicle was being used exclusively in the motor carrier's business as a trucker at the time of the accident). Green Mountain has not cited any cases, nor could this Court find any, that would require State National to prove anything more than the fact that at the time of the accident, Sanchez was hauling only for Pro Transport. In other words, it appears that regardless of whether Sanchez was in strict compliance with the terms of the Agreement that required him to haul exclusively for Pro Transport during that year, so long as he was only hauling for Pro Transport at the moment the accident occurred, the exclusivity requirement of subsection (d) has been satisfied.

Given the Court's earlier finding that the evidence presented at trial proved by a preponderance of the evidence that Sanchez was driving exclusively for Pro Transport at the time of the accident (see discussion supra at pp. 33-34), the Court finds that the exclusivity requirement of subsection (d) is satisfied.

2)  Valid Operating Authority Requirement

a)  Parties' Arguments

Turning to the question of whether the Sanchez vehicle was being operated pursuant to "operating rights" granted by a public authority, nowhere in the Policy are the terms "operating rights" or "public authority" defined. The only evidence introduced at trial discussing the meaning of these terms was Mr. Palumbo's testimony that it was his understanding that the "public authority" referenced in the Truckers Endorsement referred to the FMCSA (Tr. at 20-24), and Mr. Ruke's testimony about how motor carriers obtain FMCSA operating authority. (Id. at 54-57). Indeed, neither party has presented any relevant case law to explain the phrase

62

"operating rights granted to you by a public authority."

State National argues that this provision is satisfied because the Sanchez vehicle was being operated pursuant to the terms and regulations of the Motor Carrier Act of 1980. (S.N. Mem. at 32). In support of this argument, State National relies on printouts from the FMCSA website illustrating that Pro Transport was a licensed carrier at the time of the accident. (Id. at 32-33, Exs. 26,[53] 27). These printouts detail Pro Transport's insurance history, showing that State National provided insurance coverage to Pro Transport beginning on March 9, 2001 and that State National's coverage was cancelled on May 3, 2001.[54] (See S.N. Ex. 27[55]).[56] State National argues that because it "defies logic" that the FMCSA would post information for unauthorized carriers, the existence of the web page containing Pro Transport's insurance history is evidence that Pro Transport was operating with valid authority. (S.N. Mem. at 33).

In addition, State National relies upon the Insurance Acceptance Report from the FMCSA that contains a confirmation number issued to Pro Transport by the FMCSA when proof of Pro Transport's financial responsibility was filed. (See S.N. Mem. at 33; see also S.N. Ex. 10). Citing Green Mountain's own expert's testimony, State National notes that a motor carrier

---

[53]Green Mountain contends that Exhibit 26 should not be given credence by the Court because "there was no testimony regarding the Exhibit that gave the Court guidance as to how the Exhibit should be interpreted." (G.M. Mem. at 41).

[54]This Court previously determined that the Policy was not actually cancelled and accordingly, was in effect on the date of the accident. (See 2/25/08 Order).

[55]The Court relies solely upon State National's Exhibit 27 because State National's Exhibit 26 appears to be the same document but the photocopy is cut off on the right side, obscuring the dates of cancellation. (Compare S.N. Ex. 26 with S.N. Ex. 27).

[56]Pro Transport then obtained insurance from The Insurance Company of the State of Pennsylvania on December 11, 2002, and that insurance coverage was cancelled on December 11, 2003. (See S.N. Ex. 27).

"would have to file an application and provide[] evidence of the existence of the appropriate financial responsibility" in order to obtain operating authority from the FMCSA.  (Id.)  State National argues that these exhibits demonstrate that Pro Transport filed an application to obtain operating authority (citing S.N. Ex. 21[57]) and provided the required proof of its financial responsibility to the FMCSA.  (S.N. Mem. at 33 (citing S.N. Exs. 26, 27[58])).  Here again, State National argues that because the FMCSA would not retain and post such information if Pro Transport were not an authorized motor carrier, "[t]he more sensible reading of the documents i[s] that Pro Transport did have operating authority at the time of the accident."  (Id.)

In response, Green Mountain relies upon a different web page on the FMCSA website entitled "Authority History."  (G.M. Mem. at 7; see also G.M. Ex. 41).  Based on this document, Green Mountain argues that Pro Transport did not have valid operating authority at the time of the accident because "Pro Transport's authority was revoked on March 1, 1999 and was not reinstated until March 10, 2005," and that it was revoked again on December 19, 2005.  (G.M. Mem. at 7; see also G.M. Ex. 41; Tr. at 27 (citing Ruke's testimony that "FMCSA regulations require that a motor carrier procure and maintain MC operating authority to haul processed goods interstate")).  Green Mountain also disputes State National's contention that the FMCSA website would not include information for unlicensed motor carriers and argues "[t]he uncontroverted evidence shows that the FMCSA assigns a USDOT number if the carrier registers" with the

---

[57]Exhibit 21 is labeled "Motor Carrier Identification Report (Application for U.S. DOT Number)."  It contains a number of documents, many of which are signed by Pagan and have to do with Pro Transport's compliance with the FMCSA safety regulations.  (See S.N. Ex. 21).  The first page of the application is dated March 6, 2001, but it is not signed by either Pagan or an authorized official, both of which appear to be required.  (See id.)

[58]After some discussion, the Court admitted Exhibits 26 and 27 into evidence.  (See Tr. at 212).

FMCSA and "[f]rom that point forward[,] [all] relevant information as to that motor carrier is posted on the FMCSA website." (Id. at 40) (citing to Tr. at 46-48, 51).

   b) <u>Analysis</u>

   Although the parties have failed to provide any case authority whatsoever defining the requirement that the covered auto is "being used pursuant to operating rights granted to you by a public authority," the Court finds that a plain reading of the text suggests that the "operating rights" need to be granted to the Policy's holder, Pro Transport; but, it is unclear whether the "public authority" refers to a specific authority. It is equally unclear what is meant by the phrase "operating rights." While Mr. Palumbo testified that the phrase "public authority" means the FMCSA, this testimony is self-serving and no case law has been provided to substantiate his interpretation of the term. (See Tr. at 20-21). Moreover, at least one court has found that the phrase "public authority" is "not limited to the ICC [and] thus, it can just as easily be construed to mean a license from any public authority, such as a driver's license or trucker's license." <u>Prestige Cas. Co. v. Michigan Mut. Ins. Co.</u>, 99 F.3d 1340, 1351 (6th Cir. 1996) (holding that the insurance policy of a lessor of trucks who leased his vehicle to an entity, hired a driver for the truck, and then "borrowed back" the truck was primary when the trucker got into an accident).

   More importantly, the Court finds the evidence as to whether Pro Transport had valid operating authority at the time of the accident inconclusive. Although Green Mountain would have the Court find that Mr. Ruke's testimony proves that Pro Transport's authority was revoked at the time of the accident, the Court found Mr. Ruke's testimony to be largely unpersuasive, particularly because the website printout relied upon by Mr. Ruke was wholly unclear. Not only does it seem unlikely that the full set of available information relating to Pro Transport's

operating authority was included in the document provided by Green Mountain, but additionally, it is unclear what the information provided actually means. Without additional evidence as to the import of the information contained in the website printout relied upon by Mr. Ruke, the Court accords Mr. Ruke's testimony little weight. As such, the Court finds that Green Mountain failed to provide a persuasive explanation as to whether Pro Transport was operating with or without the proper authority at the time of the accident.

Moreover, the evidence provided by State National suggests that Pro Transport was, in fact, operating with the proper authority at the time of the accident. State National notes that Pagan specifically testified that he never received notification that his operating authority had been withdrawn. (S.N. Mem. at 33). Additionally, although Green Mountain argues, based on Palumbo's testimony, that from the point at which a USDOT number is assigned to a motor carrier, "relevant information . . . is posted on the FMCSA website," the cross examination of Palumbo revealed that this is not precisely correct. (See G.M. Mem. at 40). Rather, according to Palumbo, a motor carrier's information is posted on the FMCSA website not when the motor carrier is assigned a USDOT number, but instead, only after an insurance carrier or similarly-situated entity has provided sufficient evidence to the FMCSA that the motor carrier has met the FMCSA financial responsibility requirements. (See discussion supra at pp. 10-11).

As such, regardless of whether the FMCSA website accurately portrays Pro Transport's circumstances at the time of the accident, public policy concerns lead the Court to conclude that it would violate the dictates of the FMSCA to excuse from liability a trucking entity that purports to have interstate operating authority and hires an independent contractor, knowing that the independent contractor would not be covered under its insurance policy because the trucking

66

entity had not fulfilled its obligations to obtain proper operating authority. Such a result would run directly counter to the purposes of the FMCSA regulations that were designed to prevent entities such as Pro Transport from avoiding responsibility to innocent third parties simply by failing to comply with the federal regulatory scheme. As the Court in Casey v. Selected Risks Insurance Company explained, coverage under the policy is available "even if the insured breaches . . . some other provision of the policy which would ordinarily bar recovery," if providing such coverage furthers the intention to "protect members of the public" who are injured "by leased or owned tractors or trailers." 176 N.J. Super. at 31, 422 A.2d at 88.

Accordingly, since neither party has presented a persuasive argument to the Court regarding the meaning of this phrase, and there is little case law that appears to exist on this issue, the Court finds that any failure on the part of Pro Transport to comply with the Policy provision requiring it to obtain "operating rights granted . . . by a public authority" does not preclude a finding in this case that Sanchez is an "insured" pursuant to the Truckers Endorsement.[59]

F.  Legal Obligation to Pay Damages Under the Policy

According to the terms of the Policy, as explained in the BAC Form, State National

---

[59]Since the Court finds that coverage was provided to both Pro Transport and Sanchez under Symbol 8 and 9 of the Policy, the Court has not addressed the impact of the MCS-90 Endorsement, which functions as a stop-gap source of coverage when an insurance policy otherwise would not apply to a particular vehicle. See QBE Ins. Co. v. P & F Container Servs., Inc., 362 N.J. Super. 445, 450-51 (N.J. Super. Ct. App. Div. 2003) (citing Travelers Indem. Co. v. Western Am Specialized Trans. Co., Inc., 409 F.3d 256, 260 (5th Cir. 2005); Canal Ins. Co. v. Carolina Cas. Ins. Co., 59 F.3d 281, 283 (1st Cir. 1995) (holding that the MCS-90 endorsement is a "safety net. . . .[I]t simply covers the public when other coverage is lacking")) (explaining that under an MCS-90 Endorsement, "the insurer becomes a surety for the interstate carrier in any case where there is no other coverage provided, either by that carrier or indirectly by the owner of the leased vehicle"). The MCS-90 "operates a suretyship for the benefit of the public." QBE Ins. Co. v. P & F Container Servs., Inc., 362 N.J. Super. at 450-51 (citing Travelers Indem. Co. v. Western Am Specialized Trans. Co., Inc., 409 F.3d 256, 260 (5th Cir. 2005); Canal Ins. Co. v. Carolina Cas. Ins. Co., 59 F.3d 281, 283 (1st Cir. 1995) (holding that the MCS-90 endorsement is a "safety net. . . .[I]t simply covers the public when other coverage is lacking").

agreed to:

> [P]ay all sums an "insured" <u>legally must pay</u> as damages because
> of "bodily injury" or "property damage" to which this insurance
> applies, caused by an "accident" and resulting from the ownership,
> maintenance[,] or use of a covered "auto[.]"

(S.N. Ex. 10) (emphasis added).  Since the Court has found that the Sanchez vehicle is a

"covered auto," and because the parties do not appear to dispute that the injuries caused in the

underlying action constitute "bodily injury" as defined by the Policy (<u>see</u> S.N. Mem. at 17; <u>see</u>

<u>generally</u> G.M. Mem.), the Court now turns to the issue of whether State National was legally

obligated to pay damages in this action, as appears to be required by the terms of the Policy.[60]

The terms of the Policy provide for the fact that State National may, at its discretion,

settle claims on behalf of insured entities.  Indeed, the Policy states:  "We may investigate and

settle any claim or 'suit' <u>as we consider appropriate</u>."  (S.N. Ex. 10) (emphasis added).  Based on

the plain language of the Policy, it appears that State National was acting in accordance with its

Policy in paying to settle the action brought by the Luizzis.

Nonetheless, Green Mountain argues that State National failed to prove that it abided by

the terms of its own Policy in paying to settle the underlying claim because, according to Green

Mountain, "[n]o evidence was presented by State National at trial that Sanchez was operating his

truck negligently at the time of the Luizzi[-Sanchez] Accident or that Sanchez (or Pro Transport

for that matter) was otherwise legally obligated to Luizzi."  (G.M. Mem. at 1).  Citing no case

law to support its argument, Green Mountain further argues that State National failed to prove

---

[60]Although Green Mountain seems to suggest that the issue of whether State National was
legally obligated to pay damages under the Policy is the same issue as whether Green Mountain
is obligated to indemnify State National, these are distinct issues that require separate
discussions.  (<u>See</u> G.M. Mem. at 15-16).

that it acted reasonably in settling the underlying action.  (Id. at 16).  For these reasons, Green

Mountain argues that State National failed to abide by the terms of its Policy in settling the

underlying action with the Luizzis.  (Id. at 16).

 In response, State National argues not only that Green Mountain failed to provide any

legal support for its assertions, but additionally, that Green Mountain failed to raise these

arguments at any point prior to its post-trial brief:  it did not raise the issue in its proposed jury

instruction, in its trial memorandum, nor in the conferences leading up to the trial.  (S.N. Reply at

4-5).  State National further argues that it is obligated to settle claims on behalf of insured

individuals when it believes in good faith that the insured could be held liable should the case

proceed to trial.  (See S.N. Mem. at 17) (citing cases that discuss the requirements for

indemnification).[61]

 After carefully considering the parties' arguments, the Court simply cannot accept Green

Mountain's wholly unsupported assertion that in order for State National to have acted in

accordance with the terms of its own Policy in settling the underlying claim, State National

needed to prove either Sanchez's negligence or that either Sanchez or Pro Transport was

otherwise legally obligated to Luizzi.  Such an allegation suggests that any time State National

desires to settle a claim, it first must go to trial and obtain a legal finding against its insured.

Such a premise is both unsupported by case law and practically speaking, illogical and in direct

contradiction to the explicit language of the Policy, which affords substantial discretion to the

---

[61]State National goes on to argue that it has provided sufficient proof to warrant common
law indemnification as well as coverage pursuant to the MCS-90.  (See S.N. Reply at 6-7).  Since
these issues are separate from whether State National acted in accordance with the terms of its
own Policy and are not the subject of this framed issue hearing, the Court does not address them
at this juncture.

insurer to settle as it "consider[s] appropriate."

As such, the Court finds that State National's decision to settle the underlying suit was in accordance with the terms of the Policy, taking into account the "legally obligated" language contained therein.

## CONCLUSION

The Court hereby finds that the Court finds that State National has sustained its burden by proving by a preponderance of the evidence that the Sanchez vehicle qualifies as a "covered auto" pursuant to the Policy and that the Policy provided coverage to both Pro Transport and Sanchez for the underlying action in this case. The Court further holds that State National was acting in accordance with the terms of the Policy when it settled the underlying action with the Luizzis.

The parties are directed to appear before the undersigned for a conference in this matter on **September 5, 2013** at **11:00 A.M.** The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      July 31, 2013

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

70